*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 10a0323p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA ex rel.,
                              *Plaintiff-Appellee,*

SALLY CHRISTINE SUMMERS,                                      No. 09-5883
                              *Plaintiff-Appellant,*

        *v.*

LHC GROUP, INC.,
                              *Defendant-Appellee.*

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 09-00277—Thomas A. Wiseman, Jr., District Judge.

Argued:  June 15, 2010

Decided and Filed:  October 4, 2010

Before:  KEITH, BOGGS, and McKEAGUE, Circuit Judges.

_____

## COUNSEL

**ARGUED:**  Phillip L. Davidson, Nashville, Tennessee, for Appellant.  William H. Jordan, ALSTON & BIRD, LLP, Atlanta, Georgia, Ellen Bowden McIntyre, ASSISTANT UNITED STATES ATTORNEY, Nashville, Tennessee, for Appellee. **ON BRIEF:**  Phillip L. Davidson, Nashville, Tennessee, for Appellant.  William H. Jordan, Lisa Barry Frist, ALSTON & BIRD, LLP, Atlanta, Georgia, Ellen Bowden McIntyre, ASSISTANT UNITED STATES ATTORNEY, Nashville, Tennessee, for Appellee.

        BOGGS, J., delivered the opinion of the court, in which McKEAGUE, J., joined. KEITH, J. (pp. 18-21), delivered a separate opinion concurring in the result.

---

**OPINION**

---

BOGGS, Circuit Judge.  Appellant Sally Summers ("Summers") appeals an order of the district court denying her motion under Federal Rule of Civil Procedure 59(e) to alter an earlier judgment dismissing with prejudice the claims that she had brought pursuant to the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*  Summers argues that the district court applied an improper legal standard by holding that her failure to comply with the FCA's requirement that complaints in *qui tam* actions be filed under seal was, in and of itself, fatal to her claim.  She further argues that the correct legal standard is one in which the nature and circumstances of the violation are taken into account, and that the district court failed to consider those factors.  We hold that the FCA's language defeats Summers's argument, and affirm.

**I**

Summers filed the complaint in this case on March 20, 2009.  According to the complaint, Summers was, in 2008, employed as a physical therapist by the appellee LHC Group, Inc. ("LHC"), a corporation engaged in the business of providing in-home health services to patients insured by Medicare.  The complaint further alleged that LHC routinely continued to recommend, provide, and bill Medicare for health services for patients even after staff members informed their managers that such care was no longer needed.  Summers alleged that she herself had repeatedly complained to LHC management that these actions were fraudulent, but was told "not to mention the word fraud" and that LHC management took no action to address her concerns.  She further claimed that, on December 10, 2008, LHC employed a pretextual reason to terminate her employment and that the real reason for her termination was her complaints about LHC's fraudulent actions.

Summers's complaint pled federal jurisdiction over her claims via the FCA, in that "[t]he aforementioned acts committed by the LHC management and employees

constituted fraud against the United States Government in violation of 31 U.S.C. § 3729-3733 *et seq.*, 'The False Claims Acts.'" In her prayer for relief, she requested that the United States be served with process and that she be permitted to prosecute the case on its behalf if it should choose not to be a party.

According to an affidavit filed by Summers's counsel, shortly after the filing he was contacted by an employee of the clerk's office who inquired as to whether the complaint should be placed under seal. During that conversation, Summers alleges, counsel was told that the complaint "would not be logged into the [Electronic Case Filing] system until [counsel] and the Clerk's Office had discussed the proper filing method." Appellant's Br. at 6. On March 23, 2009, that same employee of the clerk's office allegedly left counsel a voicemail message informing him that, in order to file the complaint under seal, he needed to send her an email making that request. However, when counsel called the clerk's office to confirm the relevant email address, he was told by another employee there that an email would not suffice, and instead that he would be required to file a motion to seal the case.

On March 24, 2009, prior to Summers's counsel's filing any motion to seal, the complaint was posted on PACER, the publicly-accessible Internet-based portal providing access to court filings; thus, it was available to anyone with a PACER account who was willing to pay the applicable fee for accessing court documents online. On March 26, 2009, Summers's counsel received a call from an Assistant United States Attorney informing him that the U.S. Attorney's Office had seen the case on PACER. *Ibid.* Finally, on March 27, 2009, counsel filed a motion to seal the case; that motion was denied by the district court three days later for failure to set forth a basis on which it should be granted.

On April 15, 2009, LHC moved to dismiss the complaint. As a basis for its motion, LHC argued, pursuant to Federal Rule of Civil Procedure 12(b)(1), that the failure of Summers's counsel to file the complaint under seal violated the requirements of the FCA, leaving the court without subject matter jurisdiction. LHC also argued in the alternative that, pursuant to Federal Rule of Civil Procedure 12(b)(6), Summers had

failed to state a claim on which relief could be granted.[1]  Before the district court could rule on LHC's motion to dismiss, Summers filed a motion to amend her complaint on April 22, 2009.  Rather than attaching her proposed amended complaint to that motion, however, she filed it as a separate, and publicly-available, docket entry.  She then filed yet another publicly-available version of the complaint, styled "Substituted Amended Complaint," on April 23, 2009, without the district court's permission.

The district court granted LHC's motion to dismiss on June 11, 2009.  *United States ex rel. Summers v. LHC Grp. Inc.,* No. 3:09-CV-277, 2009 WL 1651503 (M.D. Tenn. June 11, 2009).  In so doing, the court found it unnecessary to reach the question of whether a failure to meet the FCA's *in camera* filing requirements presented a jurisdictional bar, instead holding that "the failure in this case to file [the] complaint *in camera* and under seal is a fatal deficiency that requires dismissal of this action with prejudice as to the relator . . . both because her failure to comply with the statute deprives her of the ability to pursue the remedy created by the statute, and because the same failure incurably frustrates the underlying purposes of the procedural requirements."[2]  *Id*. at \*6.  The district court explicitly held that the dismissal was without prejudice as to the United States.  *Ibid*.  Summers subsequently filed a motion to alter the judgment pursuant to Rule 59(e) on June 19, 2009, which was denied in a

---

[1]LHC's motion to dismiss also argued that Summers had failed to plead fraud with particularity, as required by Federal Rule of Civil Procedure 9(b).  The district court did not reach this issue, and it is not before us.

[2]The district court, in a footnote, stated that "if it were required to make an express finding on the issue," it would hold the requirements to be non-jurisdictional, largely because if they *were* jurisdictional then a violation would require the complaint to be dismissed with prejudice to both the relator and the United States, thus depriving the United States of its right to pursue the litigation if it so chose. *United States ex rel. Summers*, 2009 WL 1651503, at \*6 n.7 (citing *United States ex rel. Ubl v. IIF Data Solutions*, 2009 WL 1254704 (E.D. Va. May 5, 2009)).  Because the issue is neither in controversy nor necessary to decide in this case, we will assume without deciding that the under-seal requirements are procedural and not jurisdictional, an assumption supported by the fact that other requirements for *qui tam* claims under the FCA are *explicitly* jurisdictional. *See Graham County Soil and Water Conservation Dist. v. United States ex rel. Wilson*, 130 S. Ct. 1396, 1401–02 (2010) (noting that 31 U.S.C. § 3730(e)(4)(A) provides that "[n]o court shall have jurisdiction over an action" based on certain previously publicly disclosed allegations or transactions); *Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.").

marginal order by the district court on July 8, 2009 "for the reasons set forth in the previous Memo and Judgment" granting LHC's motion to dismiss.

This timely appeal followed.

**II**

Although we generally review a denial of a motion to alter or amend a judgment for abuse of discretion, we address questions of law presented in such proceedings de novo. *Huff v. Metro. Life Ins. Co.*, 675 F.2d 119, 122 n.5 (6th Cir. 1982). Moreover, we specifically review de novo the district court's statutory interpretation of the FCA. *See United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 342 F.3d 634, 641 (6th Cir. 2003). Where, as here, "a statutory right is being pursued . . . and the defense raised is that the plaintiff or defendant does not come within the purview of the statute, the judicial acceptance of this defense, however it is accomplished, is the death knell of the litigation and has the same effect as a dismissal on the merits." *Rogers v. Stratton Indus., Inc.*, 798 F.2d 913, 917 (6th Cir. 1986).

**III**

**A**

The False Claims Act imposes liability on "[a]ny person who . . . knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1) (2006) (amended 2009).[3] The FCA further authorizes private persons to bring civil actions for violations of section 3729 in the Government's name, and entitles those persons to a portion of the amount recovered thereby. 31 U.S.C. § 3730(b)(1) (2006) (amended 2009); 31 U.S.C. § 3730(d) (2006) (amended 2009). In such *qui tam*

---

[3]The FCA also imposes liability on related grounds, such as knowingly making or using false records to obtain payment for false claims, or conspiring to defraud the Government by getting a false claim allowed or paid. *See* 31 U.S.C. 3729(a)(2)–(3) (2006) (amended 2009). Neither the original complaint nor either version of the amended complaint specify the precise subsections Summers wished to invoke, instead claiming only that LHC's actions violated "Title 31 U.S.C. § 3729-3733 *et seq.*, 'The False Claims Acts.'" Be that as it may, the issues in this appeal are unaffected by the type of FCA violation Summers's complaint might fairly be read to allege.

actions, however, the complaint is not immediately made available to the public or even to the defendant; instead,

> [a] copy of the complaint and written disclosure of substantially all material evidence and information the person possesses shall be served on the Government pursuant to Rule 4(d)(4) of the Federal Rules of Civil Procedure. The complaint shall be filed in camera, shall remain under seal for at least 60 days, and shall not be served on the defendant until the court so orders. The Government may elect to intervene and proceed with the action within 60 days after it receives both the complaint and the material evidence and information.

*Id.* at § 3730(b)(2) (footnote omitted). Thus the statute that creates the cause of action at issue and authorizes *qui tam* plaintiffs to pursue it also specifies that the complaint be filed under seal.

Originally, the FCA was enacted in 1863 to respond to rampant fraud in Civil War defense contracts. *Am. Textile Mfrs. Inst., Inc. v. The Ltd., Inc.*, 190 F.3d 729, 733 (6th Cir. 1999); S. Rep. No. 99-345, at 8 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5273. At the time of its passage, enforcement of a statute via the creation of a *qui tam* cause of action had been a long-accepted practice dating from at least the thirteenth century. Note, *The History and Development of Qui Tam*, 1972 Wash. U.L.Q. 81, 83 (1972) (citing 3 W. Blackstone, *Commentaries on the Laws of England* 160 (1st ed. 1768)). Nevertheless, and despite the necessity of ensuring enforcement of the Act with a minimum expenditure of resources from the already-stretched wartime government, the original FCA's *qui tam* enforcement structure was not implemented without misgivings. Distrust of the "informers" who were expected to bring acts of fraud to the government's attention led the bill's own sponsor to characterize it as "setting a rogue to catch a rogue." Cong. Globe, 37th Cong., 3d Sess. 955–56 (1863) (remarks of Sen. Howard).

Senator Howard's remarks proved prescient, most notably in 1941 when the Supreme Court decided that so-called "parasitic" *qui tam* suits under the FCA—that is, suits filed by private citizens utilizing knowledge of the alleged fraud that the relator had gleaned from criminal indictments based on the very same actions—were nevertheless

permitted by the statute. *See United States ex rel. Marcus v. Hess*, 317 U.S. 537 (1943). In response to *Hess*, Congress amended the FCA in 1943 to provide that the Government's prior knowledge of the allegations in the complaint was a jurisdictional bar to *qui tam* suits. *United States ex rel. LaValley v. First Nat'l Bank of Boston*, 707 F. Supp. 1351, 1354–55 (D. Mass. 1988).

The FCA did not require that the relator's complaint be filed under seal, however, until the passage of amendments to the Act by the 99th Congress in 1986. At that time of the 1986 amendments, the Senate Committee indicated that its "overall intent in amending the *qui tam* section of the False Claims Act [was] to encourage more private enforcement suits," but gave several other reasons for imposing the specific requirement that a *qui tam* False Claims Act complaint be filed under seal. S. Rep. No. 99-345, at 23–24. Most prominently, it noted that the under-seal requirement gave the Government the chance to determine "whether it was already investigating the claims stated in the suit and then to consider whether it wished to intervene" prior to the defendant's learning of the litigation. *Erickson ex rel. United States v. Am. Inst. of Biological Sciences*, 716 F. Supp. 908, 912 (E.D. Va. 1989) (citing S. Rep. No. 99-345, at 24); *United States ex rel. Pilon v. Martin Marietta Corp.*, 60 F.3d 995, 998 (2d Cir. 1995). Relatedly, the requirement served to "prevent alleged wrongdoers from being tipped off that they were under investigation." *Erickson*, 716 F. Supp. at 912. Consistent with these rationales, the Senate Report on the 1986 amendments specified that "[n]othing in the statute . . . precludes the Government from intervening before the 60-day period expires, at which time the court would unseal the complaint and have it served upon the defendant . . . ." S. Rep. No. 99-345, at 24. Thus the primary purpose of the under-seal requirement is to permit the Government sufficient time in which it may ascertain the status quo and come to a decision as to whether it will intervene in the case filed by the relator.

B

The statutory purpose of the under-seal requirement is of particular importance to this case, because the appellant argues that the logic of the *Erickson* decision, which the district court found persuasive, misconstrued that purpose. In *Erickson*, a district

court dismissed an FCA complaint where the relator failed to file the complaint under seal, both because "a party pursuing a statutory remedy must comply with all the procedures the statute mandates" and, separately, because "[s]ound policy also support[ed] dismissal." *Erickson*, 716 F. Supp. at 911–12. With respect to the former justification, the *Erickson* court noted that

> [i]n general, a party pursuing a statutory remedy must comply with all the procedures the statute mandates. As the Supreme Court put it . . . , if a statute "creates a new liability and gives a special remedy for it, . . . upon well-settled principles the limitations upon such liability become a part of the right conferred, and compliance with them is made essential to the assertion and benefit of the liability itself."

*Id.* at 911 (quoting *United States ex rel. Texas Portland Cement Co. v. McCord*, 233 U.S. 157, 162 (1913)) (second ellipsis in *Erickson*).

As to the "sound policy" justification, the *Erickson* court held that the provisions of the FCA were adopted to permit the Government to determine in private whether it was already investigating the claims at issue, while at the same time preventing defendants from learning they were under investigation.[4] In language echoed by the district court in this case, the *Erickson* court held that the relator's "failure to comply with the filing and service provisions irreversibly frustrates the congressional goals underlying those provisions." *Id.* at 912.

Summers argues that *Erickson* incorrectly construed the intent behind the sealing requirements, and that therefore, by relying on the logic of *Erickson*, the district court in this case erred on a matter of law. According to Summers, *Erickson*'s reliance on non-*qui tam* cases to divine Congressional intent was inapposite, because Congress had specifically indicated that their purpose in passing the seal requirements was to balance

---

[4] The *Erickson* court also indicated that, as a secondary goal, Congress intended "to protect the defendant's reputation from unfounded public accusations." *Erickson*, 716 F. Supp. at 912. While the requirement at issue certainly has that *effect*, which could well be laudable, we have found no support in the legislative history of the 1986 amendments to the FCA for the proposition that this was one of the *purposes* of the under-seal requirement.

the needs of law enforcement with the private-law-enforcement nature of the *qui tam* provisions—a specific balance not at issue in other statutes. Appellant's Br. at 23–24.[5]

Instead, Summers urges us to adopt a balancing test adopted by the Ninth Circuit in *United States ex rel. Lujan v. Hughes Aircraft Co.*, 67 F.3d 242 (9th Cir. 1995). In *Lujan*, an employee of the defendant brought a *qui tam* action under the FCA alleging that Hughes had mischarged the Government for work it had performed on radar systems, and also alleged that she had been the victim of employment discrimination and retaliatory termination. *Id.* at 243; *See also* 31 U.S.C. § 3730(h) (establishing a separate right to relief for employees who suffer retaliatory actions as a consequence of lawful acts done in furtherance of efforts to stop FCA violations). Lujan had also, prior to filing her *qui tam* suit, made similar allegations against Hughes in the course of a wrongful termination suit and a worker's compensation claim, and had been questioned extensively about "the basis of her forthcoming *qui tam* claim" by Hughes's attorney during depositions relating to her wrongful termination suit. *Lujan*, 67 F.3d at 243–44. Though Lujan did file her *qui tam* suit under seal, approximately thirty-four days into the sixty-day under-seal period an article appeared in the *Los Angeles Times* reporting the existence of the *qui tam* suit and disclosing the general nature of Lujan's allegations; the *Times* appears to have obtained at least some of that information from Lujan herself. *Id.* at 244. After the Government eventually notified the court that it would not intervene in the case, the district court granted a motion to dismiss by Hughes on the grounds that Lujan had failed to comply with the seal provisions. *Ibid.*

---

[5]The district court in this case also cited the Second Circuit's decision in *Pilon*, in which that court affirmed a district court's dismissal of an FCA case in which the *qui tam* relators had failed to file their complaint under seal and, in fact, had given an interview about their claims to a newspaper reporter mere hours after filing. Summers attacks *Pilon* on the grounds that the court in that case inappropriately considered "other interests not addressed by [the] legislative history" (in addition to those explicit in the legislative history) in evaluating whether their conduct frustrated the purposes of the FCA, including the potential damage to a defendant's reputation. *See Pilon*, 60 F.3d at 999. It is unclear how dispositive these "other interests" were to the *Pilon* court, but Summers is nevertheless correct that there is no evidence Congress intended any particular interest of the defendant's to be protected other than the removal of a procedural quirk that could sometimes require a defendant to answer a complaint a mere two days after being served. *See supra* at n.5. Even so, *Pilon* also relied heavily on the analysis present in *Erickson* to reach its decision, and presumably would have reached the same conclusion even if the extraneous considerations had been excised. *See Pilon*, 60 F.3d at 999 ("The Pilons' failure to comply with the service and filing requirements incurably frustrated *all* of these interests.") (emphasis added).

The Ninth Circuit reversed.  Though it observed that "Lujan clearly violated the seal provision," *Lujan*, 67 F.3d at 244, it also indicated that "[n]o provision of the False Claims Act explicitly authorizes dismissal as a sanction for disclosures in violation of the seal requirement," and that the district court had erred in concluding that the authorization for such dismissal was implicit in the purpose of the seal requirement.  *Id.* at 245.  Instead, the Ninth Circuit held that, when the seal provisions are broken, the balance between the purposes of *qui tam* actions and law enforcement needs must be evaluated in light of the facts and circumstances of the case.  *Ibid.*  Specifically, the Ninth Circuit held that three factors should be considered when determining whether dismissal is an appropriate sanction for a violation of the sealing requirements:  (1) the extent to which the Government had been harmed by the disclosure; (2) the nature of the violation in terms of its "relative severity"; and (3) the presence or absence of bad faith or willfulness on the relator's part.  *Id.* at 246.  Finding that an evaluation of the facts of Lujan's case as they pertained to those factors seemingly argued against dismissal, the Ninth Circuit remanded for further consideration of whether dismissal was appropriate. *Ibid.*

LHC responds to *Lujan* primarily with a side-step: they argue that *Lujan* is inapposite because, in that case, the relator *did* file her complaint under seal, and only violated the sealing provisions after a significant portion of the sealing period had elapsed.  In so doing, they point to language in *Lujan* emphasizing the factual differences between that case and *Erickson* and *Pilon*:

> For example, in *Erickson*, the relator *completely* failed to comply with *any* of the requirements of § 3730(b)(2).  Similarly, in *Pilon*, counsel failed to file the complaint *in camera*, failed to serve the United States with a copy of the complaint and a written disclosure of the underlying evidence, and, several hours after filing, arranged for an extensive interview with a reporter.

*Lujan*, 67 F.3d at 246.

The distinction between *Lujan*'s after-filing violation and Summers's failure to file under seal at all makes for a tempting target.  Certainly, it would be rational to argue

that a very broad range of circumstances might obtain when a post-filing violation occurs, and that a plaintiff who inadvertently lets slip the substance of her complaint to the editor of a local newsletter on day fifty-nine of the *in camera* period has committed a qualitatively different act than one who marches from the clerk's office to a press conference on the courthouse steps immediately after filing. In the former case, there would be comparatively little damage possible to the Government's interest in preserving the seal, and presumably little damage done. It would further make sense to argue that, when a complaint is not filed under seal at all, the logic of *Lujan* simply does not apply because the Government has had *no* chance to evaluate the claims against the defendant, which have effectively been published to anyone willing to search the publicly available court records. Indeed, this is the reasoning relied upon by the district court and the appellees.[6]

However, the reasoning of *Lujan* itself appears to make such a distinction illusory. Rather, in evaluating the question of whether damage had been done to the Government's interest in conducting investigations without "tipping off" the defendant, the Ninth Circuit observed that

> [w]e have reason to doubt whether the Government actually suffered any harm in this case. Both parties refer in their briefs to Hughes' deposition of Lujan in her state court proceedings; the deposition took place before her *qui tam* case was filed and before any seal existed. The deposition transcript excerpts presented by Lujan indicate Hughes was aware of Lujan's intent to file a *qui tam* action and of the nature of her allegations. In light of the fact that Lujan's disclosure to the *Times* gave only general descriptions of her claims in contrast to the very detailed answers Lujan

---

[6]For its part, the Government has filed a brief asserting that the *Lujan* test "properly captured how these violations should be handled." Its discussion of this issue, however, is primarily limited to support for the particular factors considered by the *Lujan* court; it does not make a developed argument with respect to the predicate question of whether a balancing test ought to be applied in the first instance. Relatedly, we note that although the Government designated itself as an appellee in this case, and in fact was permitted to share time at oral argument with LHC Group, it appears that its real interest in this case is more closely aligned with that of the appellant. Accordingly, we have reformed the party designations as indicated on the above caption. As it has not been argued on appeal, we deliberately refrain from deciding at this time whether the Government has standing to appear as a party on appeal when it has declined to participate in an FCA case in the district court. *See United States ex rel. Smith v. Lampers*, 69 F. App'x 719, 721 (6th Cir. 2003) (assuming, in the absence of arguments to the contrary, "that the Government has standing to appeal [a] district court's final judgment dismissing [a] case with prejudice over the government's objection" even though the government did not formally exercise its right to intervene under the FCA.).

gave Hughes' attorney during her deposition, there is a strong inference that Hughes did not learn anything from the *Times* articles that it did not already know.  If Hughes learned nothing from the *Times* articles, then the articles alone could not have prompted any action by Hughes, and the Government's investigation could not have been hampered by the articles.

*Lujan*, 67 F.3d at 245–46.  Thus one critical event, in the Ninth Circuit's view, was a disclosure that occurred even before the FCA lawsuit had been filed.  Presumably, then, the Ninth Circuit would have reached the same conclusion even if the complaint had never been filed under seal, as long as nothing contained therein could have prompted any action by Hughes by supplying it with information it did not already know.  Therefore, under *Lujan*, a district court would seemingly be required to conduct the balancing-test analysis regardless of whether the alleged breach occurred after filing or due to a failure to file *in camera* altogether, and to skirt the logic of *Lujan* by making that distinction would miss its import.

Perhaps even more importantly, the questions of which factors to weigh and how to weigh them were, in the *Lujan* court's view, subsequent to a determination that a facts-and-circumstances analysis was required in order to preserve the balance Congress intended in the first place.  Tellingly, the language cited by the Appellees distinguishing the facts of *Lujan* from those of *Erickson* and *Pilon* comes from a section of *Lujan* discussing the question of how severe the breach might have been—an inquiry the court would never even reach if a facts and circumstances analysis were not appropriate.  Thus the *Lujan* court had moved on from the question presented here to an application of its newly-fashioned test.

This circuit has never addressed the question of whether a violation of the sealing provisions applicable to *qui tam* relators under the FCA precludes recovery by the relator.[7]  Now having the issue squarely before us, we decline to follow the *Lujan*

---

[7]In our nearest approach to this issue, a non-oral-argument panel of the court affirmed dismissal of a putative relator's FCA claims, noting only that "[s]ummary judgment was also proper on the claim under the False Claims Act, as Hackett complied with none of the requirements for filing a qui tam claim." *Hackett v. Martin Marietta Corp.*, 98 F.3d 1341 (table), 1996 WL 577628, at *1 (6th Cir. Oct. 7, 1996) (citing *Pilon*, 60 F.3d at 997–1000).

court's analysis, and hold that violations of the procedural requirements imposed on *qui tam* plaintiffs under the False Claims Act preclude such plaintiffs from asserting *qui tam* status.

We do so for several reasons. Most prominently, a *Lujan*-style balancing test would, in our opinion, represent a form of judicial overreach. In fashioning the FCA's procedural requirements, Congress clearly identified the factors it found relevant and considered the tension between them, and decided that a sixty-day *in camera* period was the correct length of time required to balance those factors. The Senate Committee on the Judiciary, in explaining the decision to impose the under-seal requirement, reported that

> [t]he initial 60-day sealing of the allegations has the same effect as if the *qui tam* relator had brought his information to the Government and notified the Government of his intent to sue. The Government would need an opportunity to study and evaluate the information in either situation. Under this provision, the purposes of *qui tam* actions are balanced with law enforcement needs as the bill allows the *qui tam* relator to both start the judicial wheels in motion and protect his own litigative rights. If the individual who planned to bring a *qui tam* action did not file an action before bringing his information to the Government, nothing would preclude the Government from bringing suit first and the individual would no longer be considered a proper *qui tam* relator. Additionally, much of the purpose of *qui tam* actions would be defeated unless the private individual is able to advance the case to litigation. The Committee feels that sealing the initial private civil false claims complaint protects both the Government and the defendant's interests without harming those of the private relator.

S. Rep. 99-345, at 24. Thus Congress was well aware of the various policy interests that might be affected by an *in camera* requirement, and chose a sixty-day requirement accordingly.

Two other features of the requirement support the conclusion that Congress's selection of sixty days was intended to represent its own judgment as to how to balance those interests. First, the Committee explicitly indicated that "[n]othing in the statute . . . precludes the Government from intervening before the 60-day period expires, at

which time the court would unseal the complaint and have it served upon the defendant pursuant to Rule 4 of the Federal Rules of Civil Procedure." *Ibid*. In other words, Congress understood that it was *possible* for circumstances to arise that would obviate the need for the full sixty-day period, and further demonstrated that it knew how to provide for them. The only such circumstance it appears to have found relevant, however, was one in which the Government had already decided to intervene *and had acted on that decision*. The exception is thus entirely within the Government's discretion, consistent with Congress's intent to provide it with a window in which it might "determine both if that suit involves matters the Government is already investigating and whether it is in the Government's interest to intervene and take over the civil action." *Ibid*. No such exception is found in the statute or in its legislative history for situations in which a relator simply fails to abide by the under-seal requirement.

Second, the statute also demonstrates Congress's intent by providing for a mechanism under which the Government may petition a court for extensions of the original sixty-day evaluatory period and the time during which the complaint remains under seal. However, such

> [e]xtensions will be granted . . . only upon a showing of "good cause". The Committee intends that courts weigh carefully any extensions on the period of time in which the Government has to decide whether to intervene and take over the litigation. The Committee feels that with the vast majority of cases, 60 days is an adequate amount of time to allow Government coordination, review and decision. Consequently, "good cause" would not be established merely upon a showing that the Government was overburdened and had not had a chance to address the complaint.

*Id*. at 24-25.

If Congress knew how to provide for the *extension* of the sixty-day *in camera* period in circumstances where the Government could show good cause, it surely knew how to provide for the *abbreviation* of that period when one of the other parties affected by the requirement—in this case, the relator—could show good cause. The fact that

Congress did not do so is not ours to gainsay. *See Bryant v. Dollar Gen. Corp.*, 538 F.3d 394, 402 (6th Cir. 2008) ("Established principles of statutory interpretation caution against . . . an interpretation inconsistent with the intent of Congress.") (citation and internal quotation marks omitted).

We also find unpersuasive the argument that "[t]he mere possibility that the Government *might* have been harmed by disclosure is not alone enough reason to justify dismissal of the entire action." *Lujan*, 67 F.3d at 245. The mere possibility that the Government *might* be harmed by disclosure is, in fact, the point of the *in camera* requirement. The legislative history of the 1986 amendments reveals that Congress was concerned not with punishing plaintiffs for publicizing the claims, but rather with ensuring that the Government was given a fair chance to evaluate those claims at a time when it could be certain that the status quo had not been disturbed by the defendant's knowledge that the lawsuit had been filed. In that sense, the rules are in place precisely because Congress understood that a defendant's knowledge that the Government has *in fact* been made aware of the allegations against it could well lead the defendant to change its behavior, for good or ill, and thus the extent to which the Government might be harmed by disclosure is impossible to evaluate *a priori*.

It is perhaps true that in some cases a disclosure might turn out to be relatively benign. Such an outcome, however, would be affected in large measure by information to which the plaintiff has no access, including the state of any investigation already undertaken by the Government and its own internal investigative priorities, and the extent to which a defendant may have guessed that a *qui tam* suit was coming and that defendant's tolerance for risk in the face of such a possibility. For that reason, even disclosures that cause little or no harm to the Government's interest do so through no particular virtue of the plaintiff. Requiring violations of the FCA's under-seal requirement to be subjected to a balancing test thereby both misses the point of the requirement itself and potentially encourages plaintiffs to comply with the FCA's under-seal requirement only to the point the costs of compliance are outweighed by the risk that any given violation would turn out to be severe enough to require dismissal of an

FCA claim. Under such a regime, plaintiffs would be encouraged to make disclosures in circumstances when doing so might particularly strengthen their own position, such as those in which exposing a defendant to immediate and hostile media coverage might provide a plaintiff with the leverage to demand that a defendant come to terms quickly. In other words, the extent of a plaintiff's compliance with the FCA's under-seal requirement would become subject to the same risk analysis as any other litigation tactic, an analysis in which it would be the plaintiff's, not the Government's, interests that were paramount. Given that the very existence of the *qui tam* right to bring suit in the name of the Government is created by statute, it is particularly appropriate to have the right exist in a given case only with the preconditions that Congress deemed necessary for the purpose of safeguarding the Government's interests. Summers's arguments that the cases relied upon by LHC did not themselves involve the particular balance addressed by Congress vis-a-vis the FCA are irrelevant. As a matter of statutory construction, those cases stand for the proposition that the procedural requirements imposed by a statute reflect the compromise between competing interests in the manner intended by Congress, and thus condition the plaintiff's cause of action, without regard to factors we might otherwise consider pertinent. An FCA plaintiff who cannot satisfy those conditions, like Summers, cannot bring suit in the name of the Government and has no basis for recovery.

C

Summers attempts to present a second issue in her brief on appeal, inasmuch as she argues that "the nature of the violation of section 3730(b)(2) did not warrant dismissal." *See* Appellant Br. at 20–22. In essence, this is an argument that she made a "good faith attempt to file the complaint under seal" and that her failure to do so was not willful.

These issues did not form a basis for the decision below, and remain immaterial on appeal given our analysis above. Though good faith and willfulness might be relevant if we were to accept the proposition that violations of the FCA's procedural

requirements should be analyzed through a balancing test, they carry no weight when the essential preconditions for *qui tam* status have not been met.

D

Finally, we note that the Government has asked that we clarify that any dismissal of Summers's claims is without prejudice to their ability to bring the same claims against LHC. The district court explicitly held that its dismissal was without prejudice to the United States. *United States ex rel. Summers*, 2009 WL 1651503, at *1, *6. The appellee has not challenged that determination, and indeed relies upon the fact that the district court's dismissal was without prejudice to the United States to argue that the "prejudice to the Government" element of the *Lujan* test does not weigh in Summers's favor even if that test were to apply. Appellee Br. at 23–24. As all parties appear to agree with the district court on this issue, we decline to settle a question not in dispute.

IV

Congress has created the *qui tam* cause of action in False Claims Act cases, and has imposed procedural conditions on that cause of action as it sees fit to balance competing policy goals. We will not second-guess its calculus; without meeting those conditions, a False Claims Act plaintiff has no more right to bring suit in the Government's name than any other private person. The judgment of the district court is **AFFIRMED**.

———————————————————

**CONCURRING IN THE RESULT**

———————————————————

KEITH, Circuit Judge, concurring.  Although I concur in the result the majority reaches, I write separately to provide clarification as to: 1) the current state of the law regarding dismissal of a private citizen's *qui tam* claim for failure to comply with the False Claims Act's filing procedures; and 2) Congress' intent in creating these procedures.

## I.

Although the proper rule to be used when assessing whether to dismiss a relator's improperly filed *qui tam* complaint is an issue of first impression in the Sixth Circuit, both the Second and Ninth Circuits have addressed the matter.  *United States ex rel. Lujan v. Hughes Aircraft Co.*, 67 F.3d 242 (9th Cir. 1995); *United States ex. rel. Pilon v. Martin Marietta Corp.*, 60 F.3d 995 (2d Cir. 1995).  Contrary to defendant LHC Group Inc.'s (LHC) and the district court's characterization, however, our sister circuits have adopted an approach that determines whether to dismiss an improperly filed complaint on a case by case basis, as opposed to the *per se* rule adopted here.

The district court, in concluding that letter-perfect compliance with the FCA's filing procedures is required to survive a motion to dismiss, relied primarily on *Erickson ex rel. United States v. American Inst. of Biological Scis.*, 716 F. Supp. 908 (E.D. Va. 1989).  The court in *Erickson*, lacking any guidance for its interpretation of the then relatively new procedures, concluded that dismissal of improperly filed claims is mandatory.  *Id.* at 911-12.  Since then, however, multiple courts have addressed the matter, hesitating to adopt a rule requiring dismissal.  *See Lujan*, 67 F.3d at 245 (setting out a three-part balancing test for the purposes of determining whether the court should dismiss relator's improperly filed *qui tam* complaint); *Pilon*, 60 F.3d at 998-99, 1000 n.5 (examining the impact of filing and service defects on government's ability to prosecute the case before granting dismissal and distinguishing the case from another where the procedural failure had minimal impact); *United States ex rel. Branch*

*Consultants, L.L.C. v. Allstate Ins. Co.*, 668 F. Supp. 2d 780, 803 (E.D. La. 2009) ("[N]umerous courts have held that such requirements are not jurisdictional and their violation does not require dismissal of the complaint."); *United States ex rel. Bogart v. King Pharms.*, 414 F. Supp. 2d 540, 544 (E.D. Pa. 2006) ("Although a few district courts outside the Third Circuit have held that the FCA's filing and service requirements are jurisdictional, other persuasive circuit authority calls for a balancing of factors when determining whether procedural defects warrant dismissal."); *Wisz ex rel. United States v. C/HCA Dev., Inc.*, 31 F. Supp. 2d 1068, 1069 (N.D. Ill. 1998) (denying defendant's motion to dismiss as relator's filing failure did not prevent the government from having the opportunity to determine whether to intervene); *United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Blue Cross Blue Shield of Ga., Inc.*, 755 F. Supp. 1040, 1054 (S.D. Ga. 1990) ("The Court sees no reason to demand letter-perfect compliance with the provision in a case[] such as this one[.]"); *United States ex rel. Kusner v. Osteopathic Ctr.*, No. 88-9753, 1996 U.S. Dist. LEXIS 7389, *15 (E.D. Pa. May 28, 1996) ("[T]here is nothing in the language of the False Claims Act which requires that a *qui tam* complaint be dismissed with prejudice if the confidentiality provisions are violated[.]").

As noted, among the courts that have refrained from adopting a *per se* rule are both the Second and Ninth Circuits. While the district court and LHC both read the Second Circuit's decision in *United States ex. rel. Pilon v. Martin Marietta Corp.*, as requiring dismissal in every instance, a closer reading provides a more nuanced answer. The *Pilon* court, as opposed to reflexively finding that dismissal was required, engaged in a careful analysis of the impact of the relator's violation on the United States' ability to pursue a potential case against the defendant – Congress' prime motivation in creating the filing procedures. 60 F.3d at 999. Additionally, the court discussed the relator's lack of a good faith in failing to fulfill the procedural requirements. *Id.* Only after the court completed discussing these points, did it buttress its decision with other cases reaching the same conclusion. *Id.* at 998-99. *See also, Brooks-Ngwenya v. Indianapolis Pub. Schs*, 564 F.3d 804, 808 (7th Cir. 2009) (interpreting *Pilon* as requiring dismissal only when the procedural error has caused irreparable harm); *Bogart*, 414 F. Supp. 2d at 544

(citing *Pilon* for the proposition that the court must consider the impact of the procedural error before dismissing improperly filed complaint).

Taking the *Pilon* court's analysis and restating it, the Ninth Circuit in *United States ex rel. Lujan v. Hughes Aircraft Co.*, enunciated a three-factor test to determine whether a court should dismiss an improperly filed claim, namely: 1) whether the violation actually harmed the government; 2) the nature and scope of the violation, specifically whether the relator violated all aspects of § 3730(b)(2), as opposed to only some of them; and 3) whether the relator committed the violations willfully or in bad faith. 67 F.3d at 245-247. Finding that the lower court had failed to engage in the proper balancing, the court in *Lujan* remanded the case for further proceedings in accordance with its decision. *Id.* at 248. As noted, a number of lower courts have since adopted the *Lujan* court's approach.

While the majority's interpretation of the False Claims Act is an eminently reasonable one with which I agree, I highlight that it is not based on the misinterpretation of *Pilon* L.H.C. advanced and the lower court accepted.

**II.**

LHC also argues that the imposition of a rule requiring mandatory dismissal is supported by Congress' intent in creating the requirements. LHC argues specifically that Congress, in addition to protecting the government's right to investigate the private citizen's claim, sought to safeguard the defendant's interest in not being improperly defamed. I, like the majority, find little support for LHC's argument.

Congress created the filing requirements for the primary purpose of securing for the government the opportunity to weigh the merits of a private citizen's *qui tam* claim and, if necessary, investigate the allegations made. *See* S. Rep. No. 99-345, at 24 (1986) *reprinted in* 1986 U.S.C.C.A.N. 5266, 5289; *see also, e.g., Pilon*, 60 F.3d at 998-99 (quoting the Committee report).

While the Committee noted a secondary concern regarding defendants to *qui tam* suits, it was not the concern that LHC alleges. The Committee's sole concern regarding

the rights of defendants was the potential that were the government not allowed to determine whether or not it would intervene first, the defendant may have to file an answer without knowing who it would eventually face in court. S. Rep. No. 99-345, at 24. As the court in *Lujan* stated, "[n]ever did the Committee discuss, let alone imply that it sought to protect" the defendant from attack. 67 F.3d at 247. In fact, "by providing for sealed complaints, the Committee d[id] not intend to affect the defendant's rights in any way." *Id. See also, Pilon*, 60 F.3d at 999 (listing a "defendant's reputation" as one of the "other interests *not addressed* by [the] legislative history" (emphasis added)).

Beyond merely the Committee report, the text of the Act supports this conclusion. As the majority notes, the sole party authorized by the FCA to alter the filing procedures is the Attorney General who may, at his discretion, extend the 60 day *in camera* period to facilitate a more thorough investigation. 31 U.S.C. § 3730(b)(3). Had Congress intended to protect the defendant's public reputation, it could have given the defendant similar powers or, at a minimum, once the government's investigation was complete, required that it be given notice of the claim before the complaint was made public. Instead, the text of the Act is devoid of any such provisions.

Accordingly, the majority was correct not to impute to Congress an intent to protect the defendant or to rely on such in reaching its conclusion.

### III.

Having addressed these matters, I **CONCUR** in the majority's decision.