**George L. LIADIS, Plaintiff–Appellant,**

v.

**SEARS, ROEBUCK AND CO., Defendant–Appellee.**

**No. 01–3230.**

United States Court of Appeals, Sixth Circuit.

Sept. 17, 2002.

Before RYAN and BOGGS, Circuit Judges, and HAYNES, District Judge.*

PER CURIAM.

George Liadis appeals the grant of summary judgment to defendant Sears in this Ohio state law action, based on diversity, for intentional infliction of emotional distress, negligent infliction of emotional distress, and breach of contract. We are asked to determine whether, under Ohio law, we should apply a totality-of-the-circumstances test in evaluating a claim for intentional infliction of emotional distress devoid of any connection to a Title VII claim. We conclude that we should not, and that the district court correctly granted summary judgment on all claims; we therefore affirm the judgment of the district court.

---

* The Honorable William J. Haynes, United States District Judge for the Middle District of Tennessee, sitting by designation.

## I

The current action arises out of a series of personality conflicts between George Liadis and various Sears employees, supervisors, and managers. Liadis worked at a Columbus, Ohio Sears store from August 1994 as a sales associate in the lawn and garden department. He performed his duties well, and was recognized as a leading salesperson. In 1997, Daniel Williams became Liadis's supervisor. The relationship between Williams and Liadis deteriorated rapidly. Liadis was offended by Williams's use of the terms "chief" and "kemosabe" to refer to co-workers, including Liadis. Liadis, who is of Greek origin, alleges that Williams told him to go back where he came from. Liadis also claims that Williams used profanity and humiliated him in front of customers by requiring him to assemble equipment for them. Finally, Liadis felt humiliated by a conversation in which Williams stated in front of other employees that he desired to fire Liadis, and falsely intimated that he had fired Liadis's son.

Liadis complained to Sears management about Williams's conduct. The store manager, B.T. Henry, met with Liadis on numerous occasions to discuss the problems. Sears also initiated an investigation into Liadis's claims of harassment by Williams. Although the investigation was unable to corroborate harassment, Henry met with Williams and discussed Williams's difficulties with Liadis. Henry informed Williams that disrespect for employees would not be tolerated. As a result of the meeting with Henry, Williams stopped referring to Liadis as "chief" or "kemosabe," and stopped using profanity around Liadis. Williams also severely limited his contact with Liadis. Liadis agreed, in his deposition, that Henry listened to his complaints and worked to resolve the conflict between Liadis and Williams.

Liadis also had personality conflicts with other Sears employees. In one incident, Troy Lambert, a hardware department sales coordinator, tried to block Liadis from leaving the store. Lambert had ordered Liadis to put up some signs after Liadis had clocked out. Liadis informed Lambert that he had finished for the day, and was on his way home. When Liadis stepped past Lambert, intending to leave the store, Lambert bumped into Liadis with his shoulder.

Liadis also had an ongoing conflict with Dean Lewton, another sales associate. Lewton and Liadis had an erratic friendship, marked by occasional violent disagreements. These arguments occurred both in and out of the workplace. Lewton and Liadis first quarreled violently, outside of work, at a dinner party hosted by Liadis. The conflict began at a restaurant, where Liadis became upset at racially derogatory remarks aimed at a black guest that Lewton allegedly made at the dinner. When the dinner party returned to Liadis's home, Lewton continued making drunken and racially charged threats. Lewton also brandished a knife, and screamed racial epithets. Liadis and Lewton had a physical confrontation when Liadis attempted to confiscate the knife.

The contentious relationship between Lewton and Liadis surfaced in the workplace as well. Both men were sales associates, and competed for customers and sales. Lewton apparently believed that Liadis was intercepting sales that should have been attributed to Lewton. The tensions flared into a series of arguments, during which Lewton would occasionally threaten to harm Liadis. On one occasion, Lewton threatened to get a baseball bat and beat Liadis. On another occasion, Liadis called the police because of threats by Lewton. Lewton characterized the threats as jokes. Henry again intervened,

and warned Lewton that he would be fired if he made another threat.

Finally, Liadis claims that he was humiliated because Henry investigated him and his wife after his wife bought a television at Sears at a severely discounted price. When Liadis's wife bought the television set, Henry noted the extremely high discount, and sought to verify whether the sale was legitimate. When Henry was informed that the sale was in fact legitimate, he dropped the matter. Liadis asserts that he was humiliated by the incident, because he felt as though he and his wife had been accused of theft.

Liadis attempted to transfer to another department to avoid these personality conflicts. Henry initially approved, but ultimately denied the transfer. Henry stated in his deposition that he denied the transfer because Liadis would make much less money, and that he believed solving the personal problems between Liadis and other employees was the better solution. A later transfer request was denied because Liadis's wife was working in the department to which he desired to transfer, and Sears company policy disfavors family members working in the same department. Liadis disputes that his wife was working in that department at the relevant time, or that Sears enforces such a policy.

Liadis went on short-term disability in October 1999 because of severe psychological trouble; he went on long-term disability in April 2000. Soon after going on short-term disability, Liadis sued Sears, alleging that his supervisor and fellow associates intentionally and negligently inflicted severe emotional distress on him. Liadis also brought a breach of contract action, arguing that there was an implied contract between the parties to give him a "safe workplace." The district court granted summary judgment on Liadis's negligent infliction claims, because Ohio law does not recognize a cause of action for negligent infliction of emotional distress unless the plaintiff was actually physically placed in peril. The district court also granted summary judgment on all but one of the Liadis's allegations of intentional infliction of emotional distress, holding that the minor indignities that Liadis had been subjected to did not rise to the level of outrageousness required under Ohio law. Finally, the district court granted summary judgment to Sears on the breach-of-contract claim, since Liadis's employment was at will, and the employee's manual expressly disclaimed any modification of the terms of employment.

The court reserved summary judgment on the claim for intentional infliction of emotional distress based on Lewton's at-work threats, which the court determined might be sufficiently outrageous to meet the high standards for that cause of action. The court asked for briefing on the issue of whether or not Sears could be held vicariously liable for Lewton's actions. After briefing, the court granted summary judgment to Sears on the intentional infliction claims derived from Lewton's conduct, because Lewton's intentional torts could not be characterized as benefitting his employer, and were therefore not attributable to Sears. Liadis then timely appealed.

II

We review a grant of summary judgment, and the underlying determination as to whether or not a material issue of genuine fact exists, *de novo*. Summary judgment is properly granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The evidence must be viewed in the

light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

1. Intentional Infliction of Emotional Distress

The Ohio test for intentional infliction of emotional distress is set forth in *Yeager v. Local Union 20*, 6 Ohio St.3d 369, 453 N.E.2d 666 (1983). The *Yeager* court held that a defendant who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm. *Id.* at 374. *Yeager* defined outrageous conduct by noting:

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress .... Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

*Id.* at 374–75, 453 N.E.2d 666. Bearing this high standard in mind, we turn to Liadis's claims.

a. Sears supervisory personnel.

■ The district court determined that Liadis's disagreements with Williams, his confrontation with Lambert, and the investigations by Henry did not exceed all bounds of decency, and therefore were, at most, mere insults or petty oppressions of the sort that *Yeager* held not to be actionable. *Id.* at 375, 453 N.E.2d 666. We agree. Williams's interactions with Liadis were very strained; however, Williams did respond to meetings with Henry, limited his contact with Liadis, ceased using pro-

fanity, and stopped calling Liadis "chief" or "kemosabe." Liadis's complaints were investigated, management met with Liadis and tried to work out solutions, and Williams was warned to show respect to associates on the floor. Henry's investigation of Liadis's wife was dropped when the legitimacy of the purchase became apparent. Although Lambert's actions, in attempting to prevent Liadis from leaving the store and subjecting him to unwanted physical contact, were certainly offensive and quite possibly tortious, more is required under *Yeager*. Williams, Henry, and Lambert did not engage in outrageous actions "beyond all possible bounds of decency," as defined by *Yeager*, and so we affirm the district court's grant of summary judgment on these claims. *Yeager*, 6 Ohio St.3d at 374–75, 453 N.E.2d 666.

b. Lewton and *respondeat superior*.

■ The district court found that the at-work threats made by Lewton could, if proven, rise to the level of outrageousness required by *Yeager*. However, the court properly concluded that Sears was not vicariously liable for Lewton's actions. Under Ohio law, employers are subject to liability for the torts of employees committed within the scope of employment. *Osborne v. Lyles*, 63 Ohio St.3d 326, 587 N.E.2d 825 (1992). However, an *intentional* tort committed by an employee is considered within the scope of employment only when the employee's actions were calculated to facilitate or promote the business for which he was employed. *Byrd v. Faber*, 57 Ohio St.3d 56, 58, 565 N.E.2d 584 (1991). "[A]n intentional and wilful attack committed by an agent or employee, to vent his own spleen or malevolence against the injured person, is a clear departure from his employment and his principal or employer is not responsible therefor." *Vrabel v. Acri*, 156 Ohio St. 467, 474, 103 N.E.2d 564 (1952). The district court

correctly held that Lewton's threats against Liadis were not in furtherance of Sears's business. As the district court correctly noted, although competition between sales associates is healthy for business, threats and violence are not positive competition, and do not lead to extra sales or profit.

Further, an employer is presumptively not liable for the misconduct of a nonsupervisory employee against a co-worker, unless the employer's response to complaints "manifests indifference or unreasonableness in light of the facts the employer knew or should have known." *Fenton v. HiSAN, Inc.*, 174 F.3d 827, 829 (6th Cir.1999). Here, Liadis alleges that Sears was aware of the threat posed by Lewton to other employees, and did nothing to protect employees from that danger.

Liadis offers no evidence to show that Sears responded inadequately to his complaints about Lewton. Liadis points to a portion of Lewton's deposition, in which Lewton claims that Henry and Williams were frustrated in managing the conflict between Lewton and Liadis, because Lewton and Liadis would "be friends" again after an argument. Liadis relies on this deposition to show that Williams and Henry were ordering Lewton to be unfriendly and threatening to Liadis in order to force him to resign.

The district court properly rejected this argument. As the district court noted, after Liadis complained about the threats, Sears management met with Liadis and Lewton and investigated. Lewton was warned that further threats would result in termination. Liadis stated in his deposition that following the investigation and meetings, he was not again threatened by Lewton. Lewton clearly did not consider himself to be in league with Williams, and in fact asserted in his deposition that

Williams was harassing him. Since Sears did not act unreasonably or recklessly once informed of the facts, Sears is not liable for Lewton's actions.

### c. *Hampel v. Food Ingredient Specialties, Inc.*

Liadis asserts that even if each individual indignity to which he was subject as a Sears employee does not rise to the level of outrageousness required by *Yeager*, the aggregate of the incidents is sufficiently outrageous to meet that standard. Liadis therefore argues that the district court erred in failing to apply a totality-of-the-circumstances test to his intentional infliction claim, based on the recent Ohio Supreme Court decision in *Hampel v. Food Ingredient Specialties, Inc.*, 89 Ohio St.3d 169, 729 N.E.2d 726 (2000).

The value of such an approach to Liadis is clear. He has asserted one claim based on facts (the Lewton threats) that might be sufficiently "outrageous" to meet the Ohio standard for intentional infliction of emotional distress. He has brought other claims that are based on acts attributable to Sears because they were committed by Sears supervisors. He lacks, however, a claim based on facts sufficiently "outrageous" to satisfy Ohio law that is also attributable to Sears. A "totality" test, if adopted and incorrectly applied, might gloss over each of these failings.

We reject Liadis's argument that *Hampel* creates a totality-of-the-circumstances test for intentional infliction of emotional distress. *Hampel* was a same-sex discrimination case, in which a male supervisor made inappropriate comments, containing vulgar sexual content, to a male employee. In analyzing the sexual harassment claim, the court observed that harassment because of sex need not be conduct motivated by sexual desire. The court noted:

Thus, actions that are simply abusive, with no sexual element, can support a claim for sexual harassment if they are directed at an employee because of his or her sex.... [W]e hold that any harassment or other unequal treatment of an employee or group of employees that would not occur but for the sex of the employee ... may, if sufficiently patterned or pervasive, comprise an illegal condition of employment under Title VII.

*Hampel,* 89 Ohio St.3d at 178–79, 729 N.E.2d 726.

*Hampel* then noted that sexual harassment cases, specifically hostile work environment claims, employ a totality-of-the-circumstances approach, so that harassing behavior that does not create an intolerable work environment at the first instance might be actionable if repeated. *Id.* at 180–81, 729 N.E.2d 726. The court stated: "The totality-of-the-circumstances standard precludes the kind of analysis that carves the work environment into distinct harassing incidents to be judged each on its own merits.... Thus, even where individual instances of sexual harassment do not on their own create a hostile environment, the accumulated effect of such incidents may result in a Title VII violation." *Hampel,* 89 Ohio St.3d at 181, 729 N.E.2d 726. *Hampel* concluded that because ha-

rassing conduct alleged to be because of sex need not be explicitly sexual in nature, a plaintiff may also be able to testify to episodes of non-sexual abusive treatment in order to establish the necessary severity or pervasiveness of the hostile work environment. *Id.* at 181, 729 N.E.2d 726.

The *Hampel* plaintiff alleged intentional infliction of emotional distress as well as sexual harassment. Because of this, Liadis claims that *Hampel* creates a hostile-work-environment-style cause of action for intentional infliction cases completely dissociated from any sexual harassment claim, judged by the totality of the circumstances. We reject this argument. The *Hampel* discussion regarding evidence of non-sexual instances of harassment was very clear: such instances are useful in establishing the severity or pervasiveness of harassment that, although non-sexual, targets an employee because of sex. *Id.* at 181, 729 N.E.2d 726. We decline to adopt the specialized analysis intended for hostile work environment sexual harassment claims for intentional infliction of emotional distress claims aimed at general abusive behavior in the workplace unconnected to any right set forth in Title VII.[1]

The district court properly concluded that all of Liadis's claims that could be rightly attributed to Sears did not meet the Ohio test for intentional infliction of

---

1. We note that there is nothing wrong, in principle, with the argument that behavior, not outrageous the first time it happens, very well may be so at the one-hundredth occurrence. Ohio law follows the Second Restatement of Torts closely; one of the Restatement illustrations reads:

A, a creditor, seeking to collect a debt from B, sends B a series of letters in lurid envelopes bearing a picture of lightning about to strike, in which A repeatedly threatens suit without bringing it, reviles B as a deadbeat, a dishonest man, and a criminal, and threatens to garnish his wages, to bother his employer so much that B will be dis-

charged, and to "tie B up tight as a drum" if he does not pay. B suffers severe emotional distress. A is subject to liability to B. Restatement (Second) of Torts § 46 cmt. e, illus. 7. (1965). In this illustration, it is arguably the repeated nature of the threats that elevates the conduct from minor indignity to outrageousness. We simply hold that we do not find that a court is *required,* under Ohio law, to apply a totality-of-the-circumstances test to intentional infliction claims. This is especially the case where, as here, the incidents are varied in type and degree, and form no cohesive whole save the fact that most of the events happened at Liadis's work.

emotional distress. The court also correctly decided that the one claim based on an incident that might be sufficiently outrageous to satisfy Ohio law did not rest on actions committed in furtherance of Sears's business, and therefore Sears was not liable under *respondeat superior.* We therefore affirm the judgment of the district court as to Liadis's intentional infliction of emotional distress claims.

2. Negligent Infliction of Emotional Distress

As the district court noted, under Ohio law, a claim for negligent infliction of emotional distress may only be brought "where the plaintiff has either witnessed or experienced a dangerous accident or appreciated the actual physical peril." *Bunger v. Lawson Co.,* 82 Ohio St.3d 463, 466, 696 N.E.2d 1029 (1998) (citations omitted). The district court properly granted summary judgment on this point, because Liadis was neither at the scene of an accident, or ever in actual physical peril while at work.

3. Breach of Contract

■ Liadis claims that his at-will employment contract includes an implied contract to provide him with a "safe work environment," and that this implied contract was breached by the actions of Sears supervisors and employees. Under Ohio law, employment-at-will agreements may be terminated by either party for any reason not contrary to law. *Mers v. Dispatch Printing Co.,* 19 Ohio St.3d 100, 483 N.E.2d 150 (1985). Liadis argues, essentially, that every employment contract contains an implied agreement that the employee will not be treated poorly. However, an implied contract, *qua* contract, requires a meeting of the minds and mutual assent. *Reasoner v. Bill Woeste Chevrolet, Inc.,* 134 Ohio App.3d 196, 730 N.E.2d 992 (Hamilton County, 1999).

Liadis has not asserted any promise or statement that would evidence an intention to provide such a generalized guarantee of good treatment. We decline to insert an implied clause, guaranteeing a "safe workplace," into all employment contracts. Such protection as Congress and the state legislatures wish to provide to workers already exists: employment at will may not be terminated for reasons "contrary to law." If Liadis believed that he had a plausible employment discrimination case, he could have chosen to bring that claim.

4. Liadis's Affidavit

In its first opinion, the district court granted Sears's motion to strike, as hearsay, certain portions of Liadis's affidavit offered in opposition to the Defendant's Motion for Summary Judgment. The statements were: (1) that Sears employees had admitted that they were told by Williams that his first priority was to terminate Liadis; (2) that Lewton was directed by Williams to harass Liadis, and that such harassment constituted criminal "aggravated menacing" under Ohio law; (3) that Lewton stated in his deposition that he desired to have an attorney present, that he admitted to making the threats, and that he was encouraged to do so by Williams; and (4) that other Sears employees confirmed in conversations with Liadis that Lewton made the threats at Williams's instigation. The district court concluded that the statements constituted hearsay and legal conclusions, and ordered the paragraphs stricken. On appeal, Liadis claims that the statements were admissible as statements by party-opponents, under Federal Rule of Evidence 801(d)(2), and that the district court abused its discretion in ordering the paragraphs stricken.

■ We review the evidentiary rulings of the district court for abuse of discretion.

*General Electric Co. v. Joiner,* 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). Statements by employees are outside of the scope of an employee's employment, and therefore not subject to the party-admission rule, when they concern decisionmaking processes into which the employee has no input, or decisions to which they were not a party. *Stalbosky v. Belew,* 205 F.3d 890 (6th Cir.2000). Further, the party arguing for admission bears the burden of establishing the proper foundation for the admissibility of the statements. *Mitroff v. Xomox Corp.,* 797 F.2d 271, 275 (6th Cir.1986). We do not know the position of the anonymous Sears employees referred to in the affidavit. Liadis does not say who these employees are, or why we should consider them agents authorized to speak for Sears in this litigation.

Similarly, Lewton is not a supervisor, or otherwise authorized to make admissions on Sears's behalf. In fact, Lewton also alleges that Sears discriminated against him. Lewton's deposition was directly available to the court and Liadis's gloss on these statements was unnecessary. We therefore conclude that the district court did not abuse its discretion in ordering the paragraphs stricken from Liadis's affidavit.

### III

For the above reasons, we AFFIRM the grant of summary judgment for defendant on all claims.