**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 11a0090n.06

**No. 09-1523**

| | | |
|---|---|---|
| UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT | | **FILED** FEB 10, 2011 LEONARD GREEN, Clerk |

| | | |
|---|---|---|
| RICHARD THOMPSON, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN |
| | ) | |
| CITY OF LANSING, EDWARD FORREST, *et al.* | ) | **AMENDED** |
| | ) | |
| Defendants-Appellees. | ) | |

Before: GILMAN and GRIFFIN, Circuit Judges; and COLLIER, Chief District Judge.[*]

**CURTIS L. COLLIER, Chief District Judge**. Plaintiff-Appellant Richard Thompson ("Thompson") appeals the district court's order granting summary judgment in favor of Defendant-Appellees City of Lansing and Edward Forrest ("Defendants" or "Lansing Defendants") on Thompson's reverse-discrimination claims. Thompson also appeals the district court's denial of his motion to amend the complaint. Thompson, a Caucasian male, alleges that he was not selected for a police-officer position with the City of Lansing Police Department because of the Lansing Defendants' desire to hire minorities. Specifically, he asserts that he scored higher on an initial evaluation than any minority applicants, but was "passed over" in favor of two lower-scoring individuals: a black male and a Hispanic male.

For the reasons set forth below, we AFFIRM the district court's decision.

---

[*]The Honorable Curtis L. Collier, Chief United States District Judge for the Eastern District of Tennessee, sitting by designation.

## I. Procedural History

Thompson began this lawsuit in April 2008 by filing a complaint in the Ingham County Circuit Court against the following entities and individuals: the City of Lansing, the City of Lansing Police Department, Captain Edward Forrest, and Mayor Virg Bernero. The complaint alleged that the City of Lansing's decision not to hire Thompson as a police officer was the result of reverse race discrimination, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000(e) *et seq.* ("Title VII"), and the Elliot-Larsen Civil Rights Act, Mich. Comp. Laws §§ 37.2101 *et seq.* ("ELCRA"). In response, Defendants removed Plaintiff's complaint to the Western District of Michigan.

At the close of discovery, Defendants filed a renewed motion for summary judgment. At oral argument on the motion, the district court requested additional evidence and briefing from Defendants regarding the timing of the hiring of the two racial-minority applicants for whom Thompson was allegedly "passed over." In response to the court's request, Defendants filed the two minority applicants' personnel files, which conclusively established that these applicants had already been hired months before Thompson was allegedly "bumped" to make room for them. Thompson filed a response to the supplemental filings on March 10, 2009, arguing, *inter alia*, that the court should not consider this late-filed evidence because it was not initially disclosed pursuant to Fed. R. Civ. P. 26.

On March 20, 2009, the district court granted summary judgment for Defendants on all claims, and denied Thompson's motion to amend the complaint. At the outset, the district court noted that several claims were being dismissed by stipulation: all claims against the City of Lansing Police Department, all claims against Mayor Virg Bernero, and the Title VII claim against Captain

Edward Forrest. This left only the Title VII and ELCRA claims against the City of Lansing, and the ELCRA claim against Captain Forrest. Thompson timely appealed.

## II. Relevant Facts

In February 2007, Defendant City of Lansing, through the City of Lansing Police Department, advertised that "Police Officer 1" positions would be opening up in the future, and that the Police Department would be establishing a roster of eligible candidates for future vacancies. The deadline for submitting an application was March 16, 2007. Thompson submitted an application for employment as a Police Officer I on February 12, 2007.

After receiving applications, the Police Department's next step in the hiring process was conducting oral board interviews. In these interviews, an applicant would appear before a panel typically comprised of a lieutenant, a sergeant, an officer, and a huma- resources person. Each panel member would individually score the applicant's responses to questions and, following the interview, the panel would arrive at a final consensus score. Everyone who scored above a certain threshold would then be ranked from highest scoring to lowest, and placed on a hiring roster in that order.

On March 23, 2007, Thompson was given his oral board interview, and was also required to fill out a personality questionnaire. On April 16, 2007, City of Lansing Human Resources Specialist Heather McGinnis sent Thompson a letter stating that he had successfully completed the oral board interview with a score that would allow him to be placed on the current hiring roster. The letter went on to state that the current roster would likely remain active for twelve months, and that Thompson's name would remain on the roster even if the Department ran another Police Officer Selection Process during this time period. If Thompson was selected to fill a vacancy with the Police

Department while the roster was in effect, he was told that he would be contacted regarding the next phase of the process.

On April 26, 2007, a "Hiring Process Roster" for the Police Officer 1 position was created. This roster was actually a merged 2006/2007 roster, combining applicants who had been placed on an earlier roster as part of the 2006 selection process with new 2007 selection-process applicants, including Thompson. Prior to 2007, the Police Department had run its own human resources, which included creating the hiring rosters. However, in 2007 this responsibility was assumed by City of Lansing Human Resources personnel. As a result, the merged 2006/2007 hiring roster was a joint creation of Lieutenant Craig Baylis of the Police Department and Ms. McGinnis of the City's Human Resources Department.

The roster lists applicants in order of their oral board interview scores. The roster also has a column indicating a final hiring decision for each applicant. Several applicants have typed final-hiring decisions next to their names, while the majority have handwritten entries. Lieutenant Baylis testified that at the time the 2006/2007 roster was created, final hiring decisions had already been made for several applicants from the 2006 hiring process. Thus, when creating the merged roster, Lieutenant Baylis typed in the final hiring status for those applicants who had already been hired or denied. The hiring decision column for all other applicants – including all 2007 selection-process applicants and several 2006 applicants – was left blank when the roster was created, and filled in by hand once a final hiring decision was made.

On June 25, 2007, Thompson was given and signed a "Conditional Offer of Probationary Employment." The document noted that a final offer would be extended only if Thompson satisfied certain prerequisites, including a background investigation, psychological tests, approval by the City Hiring Committee, a physical exam, and an interview with or approval by the Chief of Police.

Additionally, the letter stated, "[t]his conditional offer of employment may be withdrawn at any time in the sole discretion of the City of Lansing." Directly above Thompson's signature, the document stated, "I [] understand and agree that the conditional offer of employment does not guarantee that I will be hired by the City of Lansing, either now or at some future time."

A background investigation in fact had already commenced on Thompson following his placement on the 2006/2007 hiring roster. Detective Steve McClean conducted this investigation, and detailed it in a report dated May 31, 2007. The report was mostly objective in nature, but had an opinion section at the end. The objective portions of the report contained mostly salutary information, but did mention several past "incidents" relating to Thompson's interaction with women. According to the report, Thompson told Detective McClean that at a previous job with the Kalkaska Sheriff's Department, a female recruit complained that he was intimidating her. Thompson was ultimately cleared of any wrongdoing, and no discipline resulted. Detective McClean eventually spoke with the female officer who had filed this complaint, Deputy Karen Shipley, and she said that her complaint stemmed from the two "not seeing eye to eye" on how individual calls were handled. She stated that she did not believe Thompson had "woman issues," but that at the time he was "'pretty egotistical', much like many of the men she has now worked with in law enforcement." She did mention that Thompson had once told her he did not believe women were cut out for police work, but she believed this opinion was justified based on some of the women that she knew Thompson had worked with in the past. Deputy Shipley also directed Detective McClean to speak with another female ex-officer who had worked with Thompson in the past, Ms. Andrea Wise.

Ms. Wise described to Detective McClean an incident where she had attempted to pull over a vehicle, not realizing that Thompson was the driver of the vehicle and was working undercover. Thompson got out of his car and started yelling at her, asking "What the f— are you doing?" Ms.

Wise reported that Thompson then told her she had no authority to even pull him over, much less go on the radio and say that he was refusing to stop for her. Thompson then left the area and told his supervisor what had happened before Ms. Wise was able to get back to the station. Ms. Wise told Detective McClean she felt Thompson was a "jackass" who had issues with women. Additionally, the report noted:

> Near the end of my completion of this report, I was advised by Sgt. Del Kostanko that during a training seminar he was attending he was approached by two Sergeants from the Kalkaska Sheriff's Department that advised him that they heard Thompson had applied with our agency. They apparently advised Kostanko that if Thompson were hired he would immediately create problems for our agency.

> Kostanko provided me with the names of both the Sergeants . . . . I made several attempts to contact them re: the information they provided. Both refused to return my calls and e-mails, and of this date I have not made contact with either.

> I then further inquired through Sgt. Kostanko as to more specific information provided by the sergeants. He advised me that they said specifically that he "hated women", and that Thompson was a "job jumper" who would always be looking for a reason to sue the department.

In the "Summary" section at the end of his report, Detective McClean stated that he did not think the allegations of "woman issues" were very significant, but were instead the product of "small town, petty gossip and jealousies." Detective McClean's ultimate opinion of Thompson was positive, stating:

> I would work with, and even hang out with this guy in a minute. I personally like how he came up "the hard way" and I feel he will be able to hit the ground running, unlike many young recruits that come right out of college, after a comfortable child hood in some suburb. I see him being able to relate with those we are many times asked to relate with in a respectable, even sympathetic way when necessary. I also have no reason to think he'll have any problems standing up to those that will unquestionably challenge him personally.

Defendant Captain Edward Forrest, a black male, was responsible for reviewing all background checks of potential police officer new hires. Captain Forrest reviewed the background

report prepared by Detective McClean and decided not to recommend hiring Thompson. Captain Forrest testified that he had two concerns after reviewing the report. First, he was concerned by the fact Detective McClean had personal knowledge of Thompson. According to Captain Forrest, the Police Department had a "standing policy" against investigators conducting background investigations on people who they "have any knowledge of or that [they] know." However, Detective McClean's report states that he "recall[ed] Thompson riding with me on many occasions" years ago when Thompson was a member of Explorer Post 911, a training program for young individuals interested in law enforcement.

More significantly, Captain Forrest testified at his deposition that he was concerned by the "woman issues" mentioned in McClean's report:

Q: Why did you decide to pass on the candidacy of Mr. Richard Thompson?

A: Because of the indicators and factors that I previously explained. It appeared that there was an issue that he had with women. Also that there were individuals that came forward from his organization that provided information that I believe that there were some other underlying issues there.

After reviewing Thompson's background report, Captain Forrest brought his concerns to Chief of Police Mark Alley, a white male. Chief Alley was the ultimate decision maker in all hiring decisions. Captain Forrest expressed his opinion that Thompson should not be hired based on his background investigation. Chief Alley reviewed Thompson's background report and was concerned by "red flags" relating to Thompson's interaction with women. Chief Alley directed Captain Forrest to consult with Human Resources Specialist Susan Graham. Ms. Graham reviewed Thompson's background report, and concurred with Forrest's opinion that Thompson should not continue in the hiring process. Ultimately, Captain Forrest, Ms. Graham, and Chief Alley all agreed that Thompson did not pass the background check and should not be hired.

On July 12, 2007, Thompson received a letter from Captain Forrest dated July 3, 2007, denying him employment. Thompson immediately contacted Detective McClean to inquire about the letter. According to Thompson, Detective McClean told him, "you're not going to believe this. You're being bumped so that minorities on the bottom of the list can get moved up to be hired." Thompson claims Detective McClean then went on to reassure him that he and Lieutenant Baylis had "come up with a plan" to convince Chief Alley and Captain Forrest to hire both the minorities they wanted as well as Thompson. Detective McClean denies that he came up with a "plan" to hire minorities as well as Thompson, but acknowledges that he did meet with Captain Forrest and Lieutenant Baylis on July 13, 2007 to discuss the decision not to hire Thompson, and to clear up any "misunderstanding" there might have been with respect to the background report Detective McClean prepared on Thompson. Detective McClean testified that, from the meeting, "it was apparent that the Captain had [made] the decision. He and whomever he associates with who makes those decisions made the decision that they weren't going to hire him. I mean, I came away from that that it was pretty clear to me but that's his decision, not mine."

Following his meeting with Captain Forrest and Lieutenant Baylis, Detective McClean called Thompson on the phone. Thompson and Detective McClean both agree that, in this conversation, Detective McClean told Thompson that the reason he was not being hired was due to the "woman issues" mentioned in the background report. However, Detective McClean adamantly denies ever having told Thompson that he was being "bumped" to make room for minorities. He also testified that he would have no basis for such a statement, since he was not part of the hiring decision-making process and had not seen the hiring roster prior to speaking with Thompson.

On the 2006/2007 hiring roster, Thompson is listed seventh from the top, indicating that he received a higher score on the oral board interview than twenty-two of the twenty-nine applicants.

Next to Thompson's name is handwritten the line "didn't pass backg." The same hiring status is written next to four other applicants, one of whom is a black male. Of the twenty-nine applicants on the roster, fourteen were hired. Of these, twelve were white, one was black, and one was Hispanic. Five of these hires were from the 2006 hiring process and have the word "hired" *typed*, rather than handwritten, next to their names, indicating that they had already been hired prior to the creation of the 2006/2007 roster. Among these five individuals are the two minority hires: Randall Hon and Dontae Hairston. Of the nine applicants with "hired" handwritten next to their names, indicating that they were hired after the creation of the 2006/2007 roster, seven scored lower on their oral board interviews than Thompson. All seven of them are white.

Thompson alleges that the true reason for his not being hired had nothing to do with his background report. Instead, he claims that he was "bumped" so that the Lansing Police Department could hire less-qualified minority applicants.

## III. Standard of Review

### A. Summary Judgment

This Court reviews an order granting summary judgment de novo. *Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006); *Turner v. City of Taylor*, 412 F.3d 629, 637 (6th Cir. 2005). When reviewing a summary-judgment decision, the appellate court must confine its review to the evidence submitted to the district court. *McClung v. Wal-Mart Stores, Inc.*, 270 F.3d 1007, 1011 (6th Cir. 2001); *Laderach v. U-Haul of Northwestern Ohio*, 207 F.3d 825, 828 (6th Cir. 2000). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Int'l Union v. Cummins, Inc.*, 434 F.3d 478, 483 (6th Cir. 2006); *Turner*, 412 F.3d at 637.

When deciding a motion for summary judgment, the district court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Ciminillo*, 434 F.3d at 464; *Harbin-Bey v. Rutter*, 420 F.3d 571, 575 (6th Cir. 2005). However, the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *accord Leadbetter v. Gilley*, 385 F.3d 683, 689-90 (6th Cir. 2004); *Weaver v. Shadoan*, 340 F.3d 398, 405 (6th Cir. 2003).

## B.      Motion to Amend

This Court reviews a district court's order denying a motion to amend the complaint under an abuse-of-discretion standard. *Szoke v. United Parcel Serv. of Am., Inc.*, 2010 WL 4102905, at * 5 (6th Cir. Oct. 7, 2010). "A district court abuses its discretion when it fails to give a reason for denying the motion, applies an incorrect legal standard, misapplies the correct legal standard, or relies on clearly erroneous findings of fact." *Id.; see also Marks v. Shell Oil Co.*, 830 F.2d 68, 69 (6th Cir. 1987) (stating that a district court abuses its discretion when it fails to consider a motion to amend). However, although this Court reviews a denial of a motion to amend for abuse of discretion, "we address questions of law presented in such proceedings de novo." *United States v. LHC Group, Inc.*, 623 F.3d 287, 291 (6th Cir. 2010). Where "the district court's denial is based on a legal conclusion that the amended pleading would not withstand a motion to dismiss," this Court reviews the denial de novo. *La. Sch. Emps. Ret. Sys. v. Ernst & Young, LLP*, 622 F.3d 471, 485 (6th Cir. 2010). Similarly, this Court applies de novo review to the denial of motion to amend based on futility. *Riverview Health Inst. LLC, v. Med. Mut. of Ohio*, 601 F.3d 505, 512 (6th Cir. 2010).

## IV.  Analysis

### A.      The District Court's Grant of Summary Judgment

Thompson appeals the district court's grant of summary judgment on his reverse-discrimination claims, arguing that the court erred in finding that a question of fact did not exist. Following the stipulated dismissal of several of Thompson's initial claims, the claims remaining before the district court on which it granted summary judgment were: a Title VII reverse-discrimination claim against the City of Lansing, and ELCRA reverse-discrimination claims against the City of Lansing and Captain Forrest.

### 1.      Direct Evidence

Under both Title VII and the ELCRA, a Plaintiff has two alternative ways to show reverse discrimination: through direct evidence, or through circumstantial evidence.  Direct evidence is evidence that, if believed, "requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003) (citation omitted).

The only direct evidence cited by Thompson is Detective McClean's alleged admission that Thompson was "'bumped' in favor of minorities that Defendant Forrest had moved from the bottom of the list[,] and that room had to be made for the minorities."  Thompson claims that these remarks constitute direct evidence, requiring the conclusion that he was unlawfully bypassed in order to favor less qualified minorities.

However, Detective McClean's alleged statements are not direct evidence of reverse discrimination against Thompson for three reasons: Detective McClean was not involved in the decision-making process regarding Thompson's employment, the alleged statements are inadmissible hearsay not subject to any exception, and the alleged statements are flatly contradicted by the fact

that the minorities for whom Thompson was allegedly "bumped" were actually hired before Thompson was even placed on the hiring roster.

The Sixth Circuit has held that "comments made by individuals who are not involved in the decision-making process regarding the plaintiff's employment do not constitute direct evidence of discrimination." *Carter v. Univ. of Toledo*, 349 F.3d 269, 273 (6th Cir. 2003). Thompson concedes that Detective McClean was not the "final decision maker" regarding his employment, but asserts that he was intimately involved in the process nonetheless. The facts do not bear this assertion out.

Detective McClean testified that his role in the hiring process was limited to conducting a background investigation and submitting the results to his superiors:

> I don't have any role in the hiring. I simply do the background. I submit them, and this is typically the case I'm out of it from that point forward. . . . I don't know who makes the ultimate decision. To be honest with you, I don't.

Thompson presents no evidence contradicting this modest account of Detective McClean's role. Nor does he dispute that Detective McClean's recommendation at the end of his background report was simply an opinion, which Captain Forrest and Chief Alley had no obligation to follow. Thompson accurately, if literalistically, points out that Detective McClean "played a part" in the decision-making process, insofar as he prepared a background report that was considered by the actual decision-makers. However, Detective McClean's involvement was not in the actual process of *making the decision*, but in the process of the ministerial steps that preceded the making of the decision. Such involvement is not what is reasonably meant by "involvement in the decision-marking process." Were it otherwise, the doctor who performed Thompson's pre-employment physical, or even a secretary who filed Thompson's application papers, might also be said to be involved in the decision-making process. Simply put, Detective McClean had no substantive involvement in the decision not to hire Thompson. Accordingly, the district court correctly

concluded that his alleged statements to Thompson do not constitute direct evidence of discrimination. *See Carter*, 349 F.3d at 273 (holding that statements by a University's Vice Provost that the plaintiff's contract was not extended because of her race were not direct evidence of discrimination, since the Vice Provost, though involved in hiring and firing, was not the actual decision-maker with regard to the renewal of the plaintiff's contract); *see also Shorette v. Rite Aid of Me., Inc.*, 155 F.3d 8, 13 (1st Cir. 1998) (holding that repeated statements that "you have a perfect case of age discrimination" by an employee's supervisor were not direct evidence of discrimination, where that supervisor disavowed any participation in the decision to demote the employee).

Moreover, even if Detective McClean's alleged statements were direct evidence of discrimination, they are nonetheless inadmissible hearsay. *Cf. Carter*, 349 F.3d at 275 ("Whether a statement qualifies as nonhearsay . . . goes beyond simply determining if the declarant is a direct decision-maker with regard to the adverse employment action."). A district court may not consider hearsay evidence on a motion for summary judgment. *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 927 (6th Cir. 1999). Statements by a party's "agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship," are not hearsay. Fed. R. Evid. 801(d)(2)(D). However, the party seeking admission "bears the burden of establishing the proper foundation for the admissibility of the statements." *Liadis v. Sears, Roebuck & Co.*, 47 F. App'x 295, 303 (6th Cir.2002).

Thompson contends that Detective McClean's alleged statements are not hearsay because Detective McClean was an agent of the City of Lansing, and Thompson's hiring was "within the scope" of Detective McClean's employment. This position is untenable. As an initial matter, Thompson has failed to provide any foundation for Thompson's alleged statements. It is undisputed that at the time Detective McClean made his alleged remarks on July 12, 2007, he had not yet met

with Captain Forrest – that meeting took place on July 13, 2007. Thompson contends that Detective McClean made some investigation before calling him back and telling him that he was being "bumped" to make room for minorities, but he offers no insight into what this investigation entailed, and on what basis Detective McClean made his remarks. Without any foundation for Detective McClean's remarks, they are not admissible as party admissions.

Additionally, the subject matter of Detective McClean's alleged statements was outside the scope of his employment. "Statements by employees are outside of the scope of an employee's employment, and therefore not subject to the party-admission rule, when they concern . . . decisions to which they were not a party." *Liadis*, 47 F. App'x at 303. There is no evidence Detective McClean was involved in the decision not to hire Thompson. After he submitted his report in May, there is no evidence he was consulted by the decision makers, or had any access to the decision-making process that took place in July. In fact, Detective McClean did not even know of the decision not to hire Thompson until Thompson himself told him. Accordingly, the district court properly concluded that Detective McClean's alleged statements, even if otherwise direct evidence of discrimination, are inadmissible hearsay.

Finally, Detective McClean's alleged statements, even if considered direct evidence of discrimination and even if nonhearsay, cannot create a genuine issue of material fact because they are blatantly contradicted by the record. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Thompson alleges that he was "bumped" to make room for minorities at the bottom of the roster. However, this could not be the case. Of the fourteen applicants hired, the "bottom half" –

that is, the seven with the lowest scores – were all white individuals. Thus, there were quite literally no minorities "at the bottom of the roster" for whom Thompson was possibly "bumped." Additionally, the lowest-ranked minority who was hired had the twelfth-highest score on the roster. This means that even if the Defendants wanted to ensure that these two minorities were hired, there would be no need to "bump" Thompson from the process to do so.

Furthermore, the only two minorities hired from the merged 2006/2007 roster were hired before Thompson was even placed on the roster. The 2006/2007 roster indicates that Mr. Hon and Mr. Hairston both applied to the Police Department as part of the 2006 hiring process. Both men have the word "hired" *typed*, not handwritten, next to their names. The undisputed testimony of Lieutenant Baylis is that when he created the 2006/2007 roster, he typed the word "hired" for applicants from the 2006 process who had already been hired. Thompson's argument is illogical: he was "bumped" because the Police Department wanted to hire people who had already been hired. Thus, even if Detective McClean made the statements Thompson claims he did, and even if they are direct evidence and nonhearsay, they are so manifestly at odds with the record that the district court was not required to "adopt that version of the facts for purposes of ruling on a motion for summary judgment."[1] *Scott*, 550 U.S. at 380.

----

[1]As mentioned earlier, the Defendants late-filed several exhibits after the hearing on their motion for summary judgment, at the request of the district court. These exhibits show that Mr. Hon received a "Conditional Offer of Probationary Employment" on November 3, 2006, and was officially hired on January 7, 2007. Mr. Hairston received a "Conditional Offer of Probationary Employment" on February 1, 2007, and was officially hired on March 25, 2007. Thus, Mr. Hon was officially hired over two months before Thompson even *applied* to the Police Department, and Mr. Hairston was officially hired almost a month before Thompson was interviewed. Thompson contested the late filing of these exhibits. The district court did not rule on the admissibility of the exhibits, observing that Lieutenant Baylis's testimony regarding the significance of *typed* entries was uncontroverted, thus the disputed exhibits were not needed to establish that the minority applicants were hired *before* Thompson was placed on the roster. Neither party briefed the admissibility issue on appeal.

## 2. Indirect Evidence

If a plaintiff cannot present direct evidence of discrimination, he may prove his claim through circumstantial evidence, applying the familiar burden-shifting analysis set forth in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973), and *Texas Department of Community. Affairs v. Burdine*, 450 U.S. 248 (1981). Under this framework, a plaintiff bears the burden of stating a *prima facie* case of discrimination. To do this, a plaintiff must establish that: (1) he is a member of a protected class; (2) he was qualified for his job; (3) he suffered an adverse employment decision; and (4) he was treated differently from similarly situated individuals who are not members of his protected class. *See McDonnell*, 411 U.S. at 802; *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1166 (6th Cir. 1996). Reverse-discrimination claims under the ELCRA follow the *McDonnell* framework unmodified; however the Sixth Circuit has slightly adapted the framework for reverse-discrimination claims under Title VII. In such cases, the plaintiff must establish the first prong by showing that there are "background circumstances" indicating that the defendant employer is the "unusual employer who discriminates against the majority." *Sutherland v. Mich. Dep't of Treasury*, 344 F.3d 603, 614 (6th Cir. 2003) (citations omitted).

If the plaintiff establishes a *prima facie* case of reverse discrimination, the burden then shifts to the employer defendant to articulate some "legitimate, nondiscriminatory reason" for the adverse action. *McDonnell*, 411 U.S. at 802. If the employer meets this burden, the burden shifts back to the plaintiff to show that the defendant's stated reason was not its true reason, but merely a pretext for discrimination. *Id.*; *Burdine*, 450 U.S. at 253.

In its motion for summary judgment, Defendants contested only the fourth element of Thompson's *prima facie* case: that he was treated differently from similarly situated individuals who

are not a member of his class. Thus, the Court will assume that the first three elements of Thompson's *prima facie* case are met.

Thompson cannot demonstrate that he was treated differently from similarly situated non-white applicants for the simple reason that he was not "similarly situated" with Mr. Hon and Mr. Hairston, the two minority applicants he identifies. Thompson applied to the Police Department as part of the 2007 hiring process, and was considered for hiring on the 2006/2007 hiring roster. Mr. Hon and Mr. Hairston applied to the Police Department as part of the 2006 hiring process, and were not considered for hiring on the merged 2006/2007 hiring roster because they had in fact already been hired. The 2006/2007 roster was a "blended" roster, comprised of applicants from the 2006 hiring process and the 2007 hiring process. Both the roster itself and Lieutenant Baylis' testimony indicate that Mr. Hon and Mr. Hairston had already been hired before the roster was created. There is no evidence any other non-white applicants were hired as part of the 2006/2007 process. Because Thompson was not being considered for employment at the same time as Mr. Hon and Mr. Hairston, he was not "similarly situated" with them.

Thompson attempts to manufacture a controversy about the hiring date of Mr. Hairston by selectively quoting Defendant's late-submitted exhibits, which, incidentally, Thompson maintains are inadmissible. A "Position Requisition Form," dated October 5, 2007, states that Mr. Hairston is a "new hire" to the "Police Officer I position," who is replacing an officer who left on July 14, 2007. Thompson claims that this reveals that Mr. Hairston was actually hired months *after* the decision was made not to hire Thompson. However, a March 20, 2007 letter, sent out to all Lansing Police Department personnel, states "[e]ffective March 25, 2007, Dontae Hairston will be hired as a Police Officer Certification Trainee." Mr. Hairston was hired as a "trainee" because, as the 2006/2007 roster clearly indicates, he needed to attend the police academy. Mr. Hairston was on the

Police Department payroll continuously beginning in March 2007, and the payroll reflects that he received a salary increase after he completed the police academy and moved into the Police Officer I position in the fall of 2007. Thus, contrary to Thompson's position, Defendants' late-filed exhibits corroborate, rather than contradict, Lieutenant Baylis' testimony that Mr. Hairston was hired before the creation of the 2006/2007 roster.

Additionally, and somewhat inconsistently with his theory described above, Thompson claims that an alleged date disparity reveals that Mr. Hairston was rushed through the hiring process ahead of Thompson. On November 27, 2006, Mr. Hairston's background report was completed. On March 20, 2007, the above-referenced letter went out to all Lansing Police Department personnel, stating "[e]ffective March 25, 2007, Dontae Hairston will be hired." On March 23, 2007, Lieutenant Bruce Ferguson sent a memo titled "Employment History – Update" to Lieutenant Baylis. In this two-sentence note, Lieutenant Ferguson stated that he had contacted Mr. Hairston's previous employer, who verified two dates. Thompson suggests that this note, dated three days after the letter stating Mr. Hairston was being hired, shows that Defendants hired Mr. Hairston without completing a background investigation. This is a far-fetched conclusion. The March 23, 2007 document does not demonstrate that Mr. Hairston was hired without completing a background check, only that a minor "update" came in after it was already determined that his background was satisfactory and that he would be hired. This is hardly surprising, and does not create a genuine issue of material fact about whether Mr. Hairston, who applied to the Police Department almost nine months before Thompson, was illegitimately "rushed" through ahead of him.[2]

_____

[2]The Court further notes the bizarreness of the theory that Mr. Hairston was "rushed" through the hiring process before Thompson in light of the fact that eight white applicants were hired who were lower on the roster than Thompson. Seven of these white applicants were ranked lower than Mr. Hairston. Hence, if Defendants' goal was to hire Mr. Hairston at the expense of a white applicant, there would have been no need to "bump" higher-ranked Thompson; Defendants simply

In sum, the district court correctly found that Thompson failed to demonstrate a genuine issue of material fact with respect to whether he was treated differently from any similarly situated non-white applicants. Although Thompson claims that he was denied employment so that lower-scoring minority applicants could be hired, the record shows that the only relevant minority applicants were hired before Thompson was even placed on the hiring roster. Thompson has therefore failed to make out a *prima facie* case of reverse discrimination, and summary judgment was properly granted for Defendants.

**B.      Motion to Amend the Complaint**

In addition to the grant of summary judgment, Thompson appeals the district court's denial of his motion to amend the complaint by adding 42 U.S.C. § 1981 and § 1983 claims. In denying Thompson's motion to amend, the district court noted that the proposed claims "involve the same relevant facts and the same legal standards as the facts and claims already before the Court on summary judgment." Because the district court had already determined that summary judgment was appropriate on the Title VII and ELCRA claims, it concluded that justice did not "so require" the joining of additional claims which would likewise be summarily disposed of.

This Court reviews a district court's denial of a motion to amend pleadings for abuse of discretion, *Szoke*, 2010 WL 4102905, at *5, although it addresses questions of law presented in such proceedings de novo, *LHC Group*, 623 F.3d at 291 . Pursuant to the Rules of Civil Procedure, a

could have refrained from hiring one of the numerous lower-ranked white applicants. Thompson cries foul at the hiring of Mr. Hairston, but is silent about Defendants' decision to hire eight white applicants who were lower-ranked than himself. Presumably he would not contend that this decision was based on racial animus, and if there was a non-discriminatory reason for hiring eight lower-ranked whites, it is difficult to see why this same reason would not apply to the decision to hire Mr. Hairston.

party may amend its pleading "with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). "The court should freely give leave when justice so requires." *Id*.

Thompson does not dispute the district court's determination that claims of racial discrimination brought under § 1981 and § 1983 are analyzed under the same standards as Title VII and ELCRA discrimination claims. *See Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999) ("We review claims of alleged race discrimination brought under § 1981 and the [ELCRA] under the same standards as claims for race discrimination brought under Title VII."); *Gutzwiller v. Fenik*, 860 F.2d 1317, 1325 (6th Cir. 1988) ("the showing a plaintiff must make to recover on a disparate treatment claim under Title VII mirrors that which must be made to recover on an equal protection claim under section 1983"). Rather, his position seems to be that his Title VII and ELCRA claims should have survived summary judgment, thus the proposed § 1981 and § 1983 claims would likewise survive summary judgment, and are therefore not futile.

However, as discussed above, we conclude that summary judgment *was* properly granted for Defendants on Thompson's Title VII and ELCRA reverse-discrimination claims. As Thompson acknowledges, the § 1981 and § 1983 claims would turn on the same facts and be subject to the same legal standards as these claims. Accordingly, amendment of the pleadings to include § 1981 and § 1983 claims would be futile. The district court therefore properly concluded that justice did not "so require" amendment of the pleadings, and thus did not abuse its discretion in denying Thompson's motion.

## V. Conclusion

For these reasons, we AFFIRM the decision of the district court.