NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0419n.06

Case No. 24-5949

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED
Sep 10, 2025
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| PEARLIE R. HILL, | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE WESTERN |
| TK ELEVATOR MANUFACTURING, INC., | ) | DISTRICT OF TENNESSEE |
| Defendant-Appellee. | ) | |
| | ) | O P I N I O N |
| | ) | |

Before: BOGGS, McKEAGUE, and MATHIS, Circuit Judges.

BOGGS, J., delivered the opinion of the court in which McKEAGUE, J., concurred. MATHIS, J. (pp. 16–28), delivered a separate dissenting opinion.

BOGGS, Circuit Judge. This appeal concerns the grant of summary judgment in favor of Appellee TK Elevator Manufacturing, Inc., on various claims of retaliation and discrimination. First, we ask whether the statement of a human-resources ("HR") employee whose job was to deliver the fact and reason that an employee has been fired qualifies for the opposing-party-statement hearsay exclusion of Federal Rule of Evidence 801(d)(2)(D). Second, we ask whether Appellant Pearlie Hill's evidence is sufficient to warrant trial. The answer to both questions is no. We affirm the district court.

I

Pearlie Hill is a Black woman who worked for about seven years (January 2014 to March 2021) on the paint line of the Middleton, Tennessee, manufacturing facility operated by TK

Elevator. She was terminated on March 30, 2021, and sued TK Elevator for retaliation under the Family and Medical Leave Act of 1933 ("FMLA"), Pub. L. No. 103-3, 107 Stat. 6 (codified as amended in scattered sections of 5 and 29 U.S.C.), Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17, and 42 U.S.C. § 1981, as well as for discrimination under Title VII and section 1981.

A

Hill's employment was governed by a collective-bargaining agreement ("CBA") that used progressive discipline for attendance violations. The CBA discipline was based on cumulative "occurrences," which expired "12 months from the date of the occurrence."[1] Six occurrences in a 12-month period resulted in "verbal warning and counseling," the seventh resulted in "a written warning," the eighth resulted in "a final written warning," and the ninth resulted in "termination of employment." Missing two hours or less of the workday was a one-half occurrence, and anything more was a full occurrence. FMLA-qualifying absences with one-hour advance notice provided to a supervisor were not considered occurrences.

In 2020, Hill received all the discipline above: a verbal warning in January, a written warning in June, and a final written warning and a termination notice in July. She was then terminated for attendance on July 15, 2020. But Hill grieved her termination on the ground that her sixth, seventh, eighth, and ninth occurrences concerned "a date during a period [in which she] had been approved for intermittent FMLA leave."

---

[1] TK Elevator disputes this. It contends "that the twelve-month period is interrupted when an employee is not actively working." But we recite the facts in the light most favorable to Hill, the nonmoving party. *Jackson v. City of Cleveland*, 925 F.3d 793, 806 (6th Cir. 2019).

B

Hill and TK Elevator settled the grievance in November 2020. Hill was reinstated under a conditional-reinstatement agreement ("CRA"). The CRA established a 180-day probationary period during which "an infraction of any company policy or procedure, and/or section of the [CBA] (attendance points and related discipline will be per CBA) [would] result in immediate termination." The CRA also emphasized that it did "not reverse or replace any previous discipline, attendance points, documentation[,] or employment action."

In the months following her reinstatement, Hill "committed additional attendance infractions." She was four minutes late to work on February 22, 2021; she was one minute late to work on March 2, 2021; she left work early on March 12, 2021; and she was five minutes late to work on March 15, 2021. She also requested FMLA leave for at least two other absences during this period, though Hartford — the plan administrator — eventually concluded that she was ineligible for FMLA leave because she had worked less than 1,250 hours in the last year. However, "[b]etween November 17, 2020[,] and March 29, 2021, [TK Elevator] did not issue Hill a single disciplinary action form for an occurrence."

C

Shortly after she restarted work, Hill's coworker Robert Kessler grabbed "her waist . . . in a sexual manner while working on the paint line." In November 2020, Hill told her supervisor, Brian Meeks, about this incident; "Meeks said he would report it[,] but she did not hear anything back." Hill testified that she felt like "Meeks didn't do anything about her complaint . . . because she is a black woman," "that there were only black women on the paint line," and that both Kessler and Meeks are white.

In early March 2021, Hill applied for intermittent FMLA leave, which TK Elevator conditionally approved for several qualifying absences and early departures while her FMLA request was pending determination. Appellant's Br. at 7. On March 15, 2021, Hill met with various HR agents at TK Elevator to discuss her FMLA request, and she was informed that the request had been denied. *Id.* at 8. "Hill disputed the propriety of the FMLA denial, and she responded by reporting her belief that the FMLA denial was in retaliation for: (1) making complaints about race discrimination against black women on the paint line to the company hotline; (2) complaining about sexual harassment in [November] 2020; and (3) expressing her intent to take FMLA leave." *Ibid.*

Then, on March 30, 2021, Hill told Meeks that "she felt uncomfortable around . . . Kessler." She told Meeks that, the day before, "Kessler pulled a frame out of a crate and the frame hit her on her backside; Kessler apologized to her[,] and she didn't know if it was intentional or an accident." She also told Meeks that "she ha[d] heard that [Kessler] made the remark that if he ever got fired . . . it would be because of sexual [harassment toward] her." Meeks summarized Hill's description of the incident in an email, had her sign it, and then brought it to HR representative Churita Butler.

TK Elevator terminated Hill less than two hours later. Butler met with Meeks and Hill to discuss the termination. Butler told Hill that TK Elevator was terminating her because she violated the attendance policy. But Hill said in her deposition that Butler later gave another reason for her termination. According to Hill, when Meeks stepped out of the room, Butler told Hill that the termination decisionmaker, Ed Sullivan — TK Elevator's manager of labor relations and Butler's supervisor — had decided that Hill "should be fired because [she] was causing trouble; causing

problems because of complaining about harassment and race discrimination; and planning on utilizing FMLA."

## II

Hill sued TK Elevator for retaliation under the FMLA, Title VII, and section 1981, and for discrimination under Title VII and section 1981. TK Elevator moved for summary judgment on all claims. Hill only opposed summary judgment as to her retaliation claims.

The district court granted summary judgment to TK Elevator on all claims. *Hill v. TK Elevator Mfg. Inc.*, No. 22-cv-1258-STA-jay, 2024 WL 4269776 (W.D. Tenn. Sept. 23, 2024). In doing so, it excluded Hill's testimony — that Butler told her that Sullivan told Butler that he terminated Hill due to Hill's complaints of harassment and discrimination — as double hearsay. *Id.* at *8. Hill appeals only the grant of summary judgment to TK Elevator on her retaliation claims under Title VII and section 1981.

## III

"We review a district court's grant of summary judgment de novo." *Jackson v. City of Cleveland*, 925 F.3d 793, 806 (6th Cir. 2019) (citation modified). "Summary judgment is appropriate when 'no genuine dispute as to any material fact' exists and the moving party 'is entitled to judgment as a matter of law.'" *Ibid.* (quoting Fed. R. Civ. P. 56(a)). Rule 56(c) "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). All evidence is construed "in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

IV

Because "inadmissible hearsay . . . cannot be considered on a motion for summary judgment," *Sutherland v. Mich. Dep't of Treasury*, 344 F.3d 603, 620 (6th Cir. 2003), we first resolve the evidentiary dispute at the core of Hill's appeal. "A district court's determination as to whether proffered evidence constitutes hearsay is a question of law that we review de novo." *United States v. Fox*, 134 F.4th 348, 381 (6th Cir. 2025) (per curiam).

The district court correctly held that Hill's testimony about Butler's statement about Sullivan's statement was inadmissible double hearsay. Hill's testimony — that Butler told her that Sullivan told Butler that Sullivan terminated Hill because Hill complained about harassment and discrimination — does not qualify for the hearsay exclusion for opposing party statements because the scope of Butler's employment did not include participating in making decisions to terminate and she lacked specific authorization to communicate anything beyond the fact that Hill was terminated for violating TK Elevator's attendance policy.

A

We begin by rejecting TK Elevator's procedural argument that Hill "waived her right to contest" this evidentiary ruling because she "failed to oppose [TK Elevator]'s objection before the District Court as permitted by Local Rule 56.1(e)." We interpret this as a forfeiture claim. "Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the 'intentional relinquishment or abandonment of a known right.'" *United States v. Olano*, 507 U.S. 725, 733 (1993) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)).

But "there can be no forfeiture where the district court nevertheless addressed the merits of the issue." *United States v. Clariot*, 655 F.3d 550, 556 (6th Cir. 2011) (citation modified).

And just as the district court addressed the merits of this testimony's admissibility, *Hill*, 2024 WL 4269776, at \*7–9, we now follow suit.

B

Hearsay is an out-of-court statement offered "to prove the truth of the matter asserted in the statement." FED. R. EVID. 801(c). Hearsay is inadmissible unless it qualifies for an exception or exclusion provided by a federal statute, the federal rules of evidence, or a Supreme Court rule. FED. R. EVID. 802. "Hearsay within hearsay" — or double hearsay — "is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule." FED. R. EVID. 805. We face double hearsay here: what Sullivan said to Butler, and what Butler then said to Hill.

The first layer — Sullivan's alleged statement to Butler that he fired Hill because Hill complained about harassment and discrimination — qualifies for the exclusion for opposing party statements. A statement is not hearsay if it: (1) "is offered against an opposing party" and (2) "was made by the party's agent or employee on a matter within the scope of that relationship and while it existed." FED. R. EVID. 801(d)(2)(D). Hill offered this statement against TK Elevator, the opposing party. And Sullivan spoke within the scope of his employment here. "Being a direct decision-maker . . . constitutes strong proof that a statement was made within the scope of employment," and Sullivan was the termination decisionmaker. *Carter v. Univ. of Toledo*, 349 F.3d 269, 275 (6th Cir. 2003).

C

But the second layer — Butler's recounting to Hill of Sullivan's statement (the first layer) — does not qualify for the Rule 801(d)(2)(D) exclusion. Butler's scope of employment included *telling* Hill that and why she was fired, but it did not include *deciding* that and why Hill was fired.

7

1

The truth of the matter asserted here in the disputed testimony is that Sullivan *decided* to fire Hill in retaliation against Hill's complaints. The opposing-party-statement exclusion thus only extends to TK Elevator employees whose scope of employment included *decisionmaking*. True, "the 'scope of employment' criterion extends beyond direct decision-makers." *Ibid.* And "there is no requirement that a declarant be directly involved in the adverse employment action." *Back v. Nestle USA, Inc.*, 694 F.3d 571, 577 (6th Cir. 2012). But the cases where we have held that scope extended beyond *direct* decisionmakers consistently still involved a declarant employee with something more: either broad oversight or specific delegation. Neither is the case here.

Broad human-resources oversight was the focus in *Back* and *Carter*. In *Back*, we held that a statement about a plan to fire the oldest employees fell within the scope of employment of the acting HR Director, whose job "include[d] involvement in employee-performance issues generally and termination specifically." *Ibid.* And in *Carter*, we held that a statement about trying to "get rid of" Black professors fell within the scope of employment of a university vice provost whose job was to ensure compliance with affirmative-action requirements, coordinate faculty recruiting and hiring, and advise the provost on tenure and promotions. 349 F.3d at 271–72.

Specific delegation to relay a message from a supervisor was the focus in *Moore v. KUKA Welding Systems & Robot Corp.*, 171 F.3d 1073 (6th Cir. 1999). We held there that an employee's statement that his supervisor had said that "bad stuff[]" would happen in the area where the plaintiff worked and that the coworker "should stay out of it unless he wanted to be fired" fell within the scope of the employee's agency relationship with the supervisor, but only because the supervisor had specifically told the employee to "pass the message along" to the person who testified. *Id.* at 1081. In a similar case, we emphasized in an unpublished opinion that the 801(d)(2)(D) exclusion

did not apply where "relaying comments from management was not part of [the employee's] job description or implicit duties." *Garrett v. Sw. Med. Clinic*, 631 F. App'x 351, 358 (6th Cir. 2014). We contrasted a case where the Fourth Circuit held that a statement conveyed by a businessman through his secretary qualified for the 801(d)(2)(D) exclusion. *Ibid.* (discussing *United States v. Portsmouth Paving Co.*, 694 F.2d 312 (4th Cir. 1982)). The key there was that "the secretary was an agent of her boss *for the purpose of relaying messages*." *Ibid.* (emphasis added).

But the evidence here shows that Butler had neither broad human-resources oversight nor specific delegation from Sullivan to tell Hill that Sullivan was firing her because she complained about harassment and discrimination. Instead, the scope of Butler's employment was limited and ministerial. She testified that she "didn't have anything to do with the [termination] decision." Butler's job was "attend[ing] meetings with employees when they were disciplined or terminated." The "normal process" at her meeting with Hill would have been to tell Hill "where [she was] on [her] points" and that she was "at termination," get Hill's signature, give Hill "a copy of her separation notice," and then "take her badge." And in this case, all that Hill's separation notice said was that the separation was due to "[p]olicy violation including but not limited to . . . [the] Attendance Policy." Butler explicitly testified that she "would not have been involved with" any "conversations with . . . Sullivan about the decision to terminate . . . Hill," which would have been "the generalist's job." Though Butler was an HR "generalist" when she was deposed, she was not involved with the decision to terminate Hill because Butler was only an HR "representative" at that time. "All [Butler] d[id] [wa]s [complete] the paperwork and sit with [Hill] and d[o] the termination. [Butler] didn't have anything to do with the decision."

9

Simply working in HR and reading out termination decisions in whose making one had no part does not rise to the level of decisionmaking required under our precedent. Reading our precedents collectively confirms that the opposing-party-statement exclusion is inapplicable if a declarant, like Butler, has neither broad human-resources oversight nor explicit delegation by decisionmakers to pass along certain messages at the core of the declarant's testimony.

In *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, a terminated plaintiff testified that her former supervisor had told her that he had heard the regional manager say that he did not want "skirts" working for him. 176 F.3d 921, 926 (6th Cir. 1999). However, we held that the opposing-party-statement exclusion didn't apply to the former supervisor because, when he made that statement to the plaintiff, he was no longer her direct supervisor and "was not involved in any of the critical appraisals of her performance that preceded her leaving work." *Id.* at 927–28. Thus, the plaintiff "failed to show that [the] statement concerned a matter within the scope of [the former supervisor's] agency or employment." *Id.* at 928.

In *Hill v. Spiegel, Inc.*, a plaintiff's subordinate testified that managers who were unrelated to the plaintiff's work told him (the subordinate) that the plaintiff "had been discharged because of his age and income." 708 F.2d 233, 237 (6th Cir. 1983). We held that the managers' statement did not fall within the scope of their employment because "[t]he mere fact that each of these men was a 'manager' within the expansive organization is clearly insufficient to establish that matters bearing upon [the plaintiff]'s discharge were within the scope of their employment." *Ibid.*

In *Huffman v. Speedway LLC*, we determined that a statement by three of the plaintiff's former coworkers did not fall within the coworkers' scope of employment because they "did not

work in [the defendant]'s human-resources department and were not involved in making accommodation decisions."  621 F. App'x 792, 799 (6th Cir. 2015).

Finally, in *Thompson v. City of Lansing*, we held that a discriminatory statement by a detective whose only role in a hiring process was "prepar[ing] a background report that was considered by the actual decision-makers" did not constitute direct evidence of discrimination because the detective "had no substantive involvement in the decision not to hire."  410 F. App'x 922, 930 (6th Cir. 2011).  The detective's "involvement was not in the actual process of *making the decision*, but in the process of the *ministerial steps* that preceded the making of the decision.  Such involvement is not what is reasonably meant by 'involvement in the decision-marking [sic] process.'  Were it otherwise, . . . *even a secretary who filed Thompson's application papers*, might also be said to be involved in the decision-making process."  *Ibid.* (emphasis added).  There was no claim that this report was anything other than ordinary and ministerial, and we held that there was "no evidence contradicting [the] modest account of [the detective]'s role."  *Ibid.*  This decisionmaking/ministerial distinction informed our conclusion that the 801(d)(2)(D) exclusion did not apply because "[t]here is no evidence [he] was involved in the decision not to hire [the plaintiff].  After he submitted his report . . . , there is no evidence he was consulted by the decision makers, or had any access to the decision-making process that took place in July."  *Id.* at 931.

3

Two themes permeate these cases.  First, a granular focus on a declarant's particular role within the company (e.g., what job within human resources).  And second, specifically in the employment-decisions context, a distinction drawn between making decisions and being ministerially involved with them.  Butler fails in both regards.  *Jacklyn* emphasizes that Butler was neither Hill's direct supervisor nor involved in "any of the critical appraisals of [Hill's]

performance." 176 F.3d at 928. *Hill* highlights how titles — "manager" there, "HR representative" here — without more are not enough to satisfy scope of employment. 708 F.2d at 237. Though Butler worked in HR, unlike the declarants in *Huffman*, Butler was *still* "not involved in making [termination] decisions." 621 F. App'x at 799. And *Thompson* explains that even preparing a background report for a hiring — which is more substantive than Butler simply telling someone that/why they're fired — is "ministerial" involvement, not part of "the actual process of *making the decision*." 410 F. App'x at 930. There we also explicitly underscored the need for a limiting principle for ministerial duties, lest we allow as "involved in the decision-making process" even "a secretary who file[s] . . . . application papers." *Ibid.*

Hill's argument that Butler "was authorized to pass along the termination information" is unconvincing. Appellant's Br. at 19. For that argument to prevail and qualify Butler for the opposing-party-statement exclusion through our specific-delegation precedent in *Moore*, Butler would have to have somehow been given the broad authority to pass along *all* termination information — including Hill's alleged "real reason" for her termination. But it's apparent that Butler didn't have that type of specific delegation. She was delegated the duty of delivering *the official* news, not the duty of delivering *all* news. It's easy to see why. No employer would tell its employee: "Your job is to deliver all our termination-related info, including secretly informing terminated employees about any illegal acts that your boss has committed."

The decisionmaking process behind termination went far beyond Butler's ministerial scope of employment. Hill's testimony was inadmissible double hearsay.

V

Hill has thus failed to present any direct evidence of retaliation. And because she has also failed to prove retaliation under Title VII and section 1981 through circumstantial evidence, the grant of summary judgment for TK Elevator on these claims was proper.

A

"The elements of a retaliation claim under § 1981 are the same as those under Title VII." *Boxill v. O'Grady*, 935 F.3d 510, 520 (6th Cir. 2019). And "[w]hen a plaintiff presents only circumstantial evidence, we examine Title VII . . . retaliation claims" under the framework in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248 (1981). *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 544 (6th Cir. 2008). "The plaintiff has the initial burden . . . to establish a prima facie case of retaliation by showing that (1) [she] engaged in protected activity, (2) this exercise of [her] protected civil rights was known to the defendant, (3) the defendant thereafter took an employment action adverse to the plaintiff, and (4) there was a causal connection between the protected activity and the adverse employment action." *Ibid.* If the plaintiff presents such sufficient evidence, "[t]he burden then shifts to the employer to produce evidence of a legitimate, nondiscriminatory reason for its actions." *Ibid.* "If the defendant satisfies this burden, the plaintiff must then demonstrate by a preponderance of the evidence that the legitimate reason offered by the defendant was not its true reason, but instead was a pretext designed to mask retaliation." *Ibid.*

B

Hill cannot establish with her circumstantial evidence a causal connection between her termination on March 30, 2021, and her complaints of sexual harassment. Hill argues that the "temporal proximity" between her complaints and her termination establishes a causal connection.

Appellant's Br. at 28. Hill claims that she performed three "pertinent protected acts": the November 2020 complaint to Meeks, the March 30, 2021, complaint to Meeks, and the March 15, 2021, complaint to various HR agents. *Id.* at 26.

But regarding the November 2020 complaint, the district court correctly identified that in *Williams v. Memphis Light, Gas & Water*, No. 23-5616, 2024 WL 3427171 (6th Cir. July 16, 2024), we held that a four-month interval — like Hill's here — is "too lengthy to independently establish causation" without any "other evidence" in the record tying the complaint to the termination. *Hill*, 2024 WL 4269776, at *10 (quoting *Williams*, 2024 WL 3427171, at *9).

Regarding the March 30, 2021, complaint, the district court correctly identified that TK Elevator "emailed Hartford on March 23, 2021, to confirm that [Hill's] requests for FMLA . . . had been denied . . . since [TK Elevator] wanted to move forward with the[] terminations [of Hill and employee Blair Wells] for violations of the attendance policy." *Id.* at *11. Thus, the decision to terminate happened before the March 30, 2021, complaint was made. Logically, this complaint could not have been the cause.

Finally, regarding the March 15, 2021, complaint, we do disagree with the district court's focus on the decision to deny FMLA leave having come before the complaint, which the district court viewed to mean that the complaint again came after the harm and thus could not have caused the harm. *See id.* at *12. The alleged harm is the firing, not the denial of FMLA leave. But we come to the same conclusion on causality. We emphasized in *Mickey v. Zeidler Tool & Die Co.* that we sometimes allow temporal proximity to establish causality under the *McDonnell Douglas/Burdine* framework because, "if an employer immediately retaliates against an employee upon learning of his protected activity, the employee would be unable to couple temporal proximity with any such other evidence of retaliation because the two actions happened

consecutively." 516 F.3d 516, 525 (6th Cir. 2008). In our case, however, TK Elevator had already been aware for months of Hill's complaints about sexual harassment.

*    *    *

For the foregoing reasons, we **AFFIRM** on all grounds.

**MATHIS, Circuit Judge.** Pearlie Hill worked for TK Elevator Manufacturing, Inc., for about seven years. Then TK Elevator terminated her. Shortly before her termination, Hill complained about sexual harassment and race discrimination.

Hill sued TK Elevator asserting various discrimination and retaliation claims. Pertinent here are her retaliation claims for complaining of race discrimination under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981. Hill says that the termination decision-maker told a human-resources representative—who then told Hill during her termination meeting—that he fired Hill in part because of her discrimination complaints. At summary judgment, the district court excluded Hill's statement as double hearsay and granted summary judgment to TK Elevator.

Hill's statement was not hearsay. The district court thus erred in excluding it. And because a genuine dispute of material fact exists as to Hill's retaliation claims, when considering the excluded evidence, TK Elevator was not entitled to summary judgment. I respectfully dissent from the majority opinion's contrary conclusions.

## I.

Hill, a black woman, worked on the "paint line" of TK Elevator's manufacturing facility in Middleton, Tennessee. R. 53-1, PageID 591. A collective bargaining agreement ("CBA") governed her employment there. Under the CBA, TK Elevator uses progressive discipline for attendance violations.

Discipline depends on the number of "occurrences," or attendance violations, the employee accumulates in the preceding twelve months. Time missed from the workday for more than two hours counts as one occurrence, while missing time from the workday for less than two hours (such as being tardy or leaving early) counts as a one-half occurrence. Six occurrences result in a verbal warning and counseling. Seven occurrences "in the same twelve (12) month period" result in a

16

written warning; eight occurrences result in a final written warning; and nine occurrences result in termination. R. 54-2, PageID 871. The CBA states that "[o]ccurrences expire 12 months from the date of the occurrence." *Id.* at 872. Yet TK Elevator contends "that the twelve-month period is interrupted when an employee is not actively working." R. 56, PageID 915.

The CBA also treats leave taken under the Family and Medical Leave Act ("FMLA") differently. Under the CBA, "FMLA qualifying absence[s]" do not count as occurrences. R. 54-2, PageID 870. To request FMLA leave, TK Elevator employees contact a third-party administrator, Hartford Life and Accident Insurance Company. After Hartford receives documentation from the employee and TK Elevator, it determines the employee's eligibility for FMLA leave. If eligible, the employee contacts Hartford for approval each time they need FMLA leave.

In the first half of 2020, Hill received a verbal, written, and final written warning for violating the CBA's attendance policy. Then in July 2020, she received a termination notice for her attendance woes. But Hill grieved the termination, arguing that she had received approved FMLA leave for her absences. The parties negotiated the grievance over the next four months, during which Hill did not work for TK Elevator. In November 2020, the parties settled the grievance and TK Elevator reinstated Hill under a conditional reinstatement agreement.

Under the agreement, Hill returned to work with full seniority but without backpay. She also agreed to a 180-day probationary period, during which "an infraction of any company policy or procedure, and/or section of the [CBA] . . . w[ould] result in immediate termination." R. 54-9, PageID 885. The agreement added that it did "not reverse or replace any previous discipline, attendance points, documentation[,] or employment action" besides her termination. *Id.* That said, the agreement clarified that "attendance points and related discipline w[ould] be per [the] CBA."

17

*Id.* Indeed, when Hill met with TK Elevator's human-resources department ("HR") to discuss the agreement, an HR representative told her that her occurrences would "continue to roll off once [she] reach[ed] [one] year from the date [she] received a point." R. 54-4, PageID 875.

Hill says that in the twelve months before her reinstatement, she had only four occurrences. Put another way, Hill claims that—when she returned to work in November 2020—she needed to accrue at least five more occurrences before TK Elevator could terminate her.

Shortly after her reinstatement, Hill told her supervisor, Brian Meeks, that a coworker, Robert Kessler, inappropriately grabbed her waist. Though Hill asserts that Meeks said he would report it, she never heard back from him. Hill believes Meeks never investigated her complaint because she is a black woman, while both Meeks and Kessler are white.

Over the next few months, Hill committed more attendance infractions, though she does not remember how many. Hill also requested FMLA leave for at least two other absences during this period. TK Elevator never disciplined her for those incidents, and HR told her the absences would not count toward discipline. Even if the incidents were occurrences, Hill believes she still did not have enough occurrences in the preceding twelve months to merit termination.

Following Hill's FMLA leave request, an HR representative from TK Elevator sent Hill's working hours from the past year to Hartford so it could determine her FMLA leave eligibility. Hartford concluded that Hill was ineligible for FMLA leave because she had worked less than 1,250 hours in the last year. Hill met with HR representatives to discuss the FMLA denial. During the meeting, she told HR that she believed TK Elevator denied her request because of her harassment and race-discrimination complaints. About a week later, TK Elevator contacted Hartford to seek "assurance" that the FMLA denial would "not come back overturned or reversed," because it was "planning on moving forward" with "[t]ermination." R. 45-6, PageID 431, 437.

Then, on the morning of March 30, 2021, Hill told Meeks about another incident with Kessler. This time, Kessler "pulled a frame out of a crate and the frame hit [Hill] on her backside." R. 53-1, PageID 602. Hill told Meeks that "she felt uncomfortable around" Kessler and that "she ha[d] heard that he made the remark that if he ever got fired . . . it would be because of sexual [harassment] on her." R. 54-10, PageID 886. Meeks summarized Hill's description of the incident in an email, had her sign it, and then brought it to an HR employee, Churita Butler. Less than two hours later, TK Elevator terminated Hill.

Butler met with Meeks and Hill to discuss the termination. Butler told Hill that TK Elevator was terminating her because she violated the attendance policy. Hill says that Butler also gave another reason for her termination. When Meeks stepped out of the room, Butler told Hill that the termination decision-maker, Ed Sullivan—TK Elevator's manager of labor relations and Butler's supervisor—decided Hill "should be fired because [she] was causing trouble; causing problems because of complaining about harassment and race discrimination; and planning on utilizing FMLA." R. 54-1, PageID 865 (citation modified).

Hill sued TK Elevator for retaliation under the FMLA, Title VII of the Civil Rights Act of 1964, and 42 U.S.C. § 1981; and for discrimination under Title VII and § 1981. TK Elevator moved for summary judgment on all claims. The district court granted summary judgment to TK Elevator. In doing so, it excluded Hill's statement—that Butler told her that Sullivan said he terminated her because of her harassment and discrimination complaints—as double hearsay. Hill appeals the district court's grant of summary judgment to TK Elevator on her Title VII and § 1981 retaliation claims.

## II.

The district court's evidentiary ruling colors its summary-judgment decision. I thus turn to that issue first.

Recall that Hill testified that Butler, during the termination meeting, told her that Sullivan decided to terminate Hill because she complained about harassment and race discrimination. TK Elevator objected to the district court relying on this statement from Hill in deciding TK Elevator's summary-judgment motion, arguing that the statement was hearsay within hearsay. The district court agreed with TK Elevator and sustained the objection. Hill argues on appeal that the district court's evidentiary ruling was erroneous.

A party opposing a motion for summary judgment must rely on admissible evidence. *U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1189 (6th Cir. 1997). This means that courts cannot consider inadmissible hearsay at the summary-judgment stage. *Sutherland v. Mich. Dep't of Treasury*, 344 F.3d 603, 620 (6th Cir. 2003).

All agree that Sullivan's statement to Butler is not hearsay. But what about Butler repeating Sullivan's statement to Hill?

Hill argues that Butler's statement is not hearsay under Rule 801(d)(2)(D) of the Federal Rules of Evidence. Under that rule, a statement is not hearsay if it "is offered against an opposing party" and "was made by the party's agent or employee on a matter within the scope of that relationship and while it existed." Fed. R. Evid. 801(d)(2)(D). There is no dispute that: (1) Hill offered the statement against TK Elevator—the opposing party; (2) Butler—a TK Elevator employee—made the statement; and (3) Butler made the statement while employed with TK Elevator. The only question is whether Butler made the statement to Hill within the scope of her employment with TK Elevator.

To answer that question, courts must consider the statement itself. *Back v. Nestlé USA, Inc.*, 694 F.3d 571, 578 (6th Cir. 2012). But the statement alone does not establish the scope requirement. *Id.* "Outside evidence sufficient to satisfy Rule 801(d)(2)(D)'s scope requirement could come from the circumstances surrounding the statement, such as the identity of the speaker or the context in which the statement was made." *Id.* (citation modified). "Being a direct decision-maker . . . constitutes strong proof that a statement was made within the scope of employment, but the 'scope of employment' criterion extends beyond direct decision-makers." *Carter v. Univ. of Toledo*, 349 F.3d 269, 275 (6th Cir. 2003). Indeed, "there is no requirement that a declarant be directly involved in the adverse employment action" when the statement "concerns a matter within the scope of the declarant's employment." *Back*, 694 F.3d at 577; *Carter*, 349 F.3d at 275.

In the employment-discrimination context, courts "focus[] the scope inquiry on whether the declarant was involved in a process leading up to a challenged decision, rather than focusing on whether the declarant was a final decision-maker." *Weil v. Citizens Telecom Servs. Co.*, 922 F.3d 993, 999 (9th Cir. 2019); *see Kidd v. Mando Am. Corp.*, 731 F.3d 1196, 1208 (11th Cir. 2013); *Simple v. Walgreen Co.*, 511 F.3d 668, 672 (7th Cir. 2007) (Posner, J.); *Yates v. Rexton, Inc.*, 267 F.3d 793, 802 (8th Cir. 2001). "Rule 801(d)(2)(D) requires only that the declarant have some authority to speak on matters of hiring" or firing. *Talavera v. Shah*, 638 F.3d 303, 309 (D.C. Cir. 2011). "Where a supervisor is authorized to speak with subordinates about the employer's employment practices, a subordinate's account of an explanation of the supervisor's understanding regarding the criteria utilized by management in making decisions on hiring, firing, compensation, and the like is admissible against the employer, regardless whether the declarant has any involvement in the challenged employment action." *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 298 (3d Cir. 2007) (citation modified).

The facts show that Butler's statement to Hill was within the scope of her employment with TK Elevator. Start with the statement. During the meeting to terminate Hill's employment, Butler told Hill that she was being terminated for exceeding the number of occurrences allowed under the attendance policy and because Sullivan decided to terminate her for complaining about harassment and race discrimination. This is what Hill recalls Butler saying during the termination meeting.

Turn next to the circumstances of the statement. At all pertinent times, Butler worked in HR for TK Elevator as either an HR representative or an HR coordinator, where she reported to Sullivan, her supervisor. She was responsible for keeping up with attendance for bargaining-unit employees such as Hill. She was also responsible for issuing progressive discipline to those employees and conducting meetings with employees when they were disciplined or terminated. As TK Elevator readily concedes, when terminating an employee, Butler would "tell[] the employee they were terminated and the reason for their termination." D. 23 at p.32.

Butler conducted Hill's termination meeting, though she does not recall "what was said." R. 53-6, PageID 843. Even so, Butler testified that "[i]t would have been [Butler], [Hill] and a union rep" at the termination meeting. *Id.* at 842. She stated that the "normal process" would have been to bring Hill to a conference room and tell her "where [she] [was] on [her] [attendance] points," and that she was "at termination." *Id.* Butler added that her job was to complete "paperwork and sit with [Hill] and d[o] the termination." *Id.* at 843. And although Butler does not recall talking to Sullivan about Hill's termination she spoke to him "about lots of employees, lots of things [] every day." *Id.* at 849.

Butler was responsible for carrying out terminations and telling employees why they were being terminated. So Butler's statement to Hill that Sullivan was terminating her for complaining about harassment and discrimination "concern[ed] a matter within the scope" of her employment

22

with TK Elevator. *See Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 928 (6th Cir. 1999) (emphasis omitted). That Butler conducted the termination meeting with Hill and completed the separation notice showed that Butler had authority to speak on terminations. *See Talavera*, 638 F.3d at 309. And the fact that Butler's job duties included keeping up with employees' attendance and meting out discipline for attendance issues shows that Butler contributed to the process leading up to Hill's termination. *See Weil*, 922 F.3d at 999. Butler's statement about why Sullivan fired Hill therefore fell within the scope of her employment as an HR representative. *See* Fed. R. Evid. 801(d)(2)(D).

To put it plainly, telling a person why she is being terminated is within the scope of employment for an employee responsible for telling people why they are being terminated.

**A.**

TK Elevator argues, relying on our decisions in *Hill v. Spiegel, Inc.*, 708 F.2d 233 (6th Cir. 1983), and *Huffman v. Speedway LLC*, 621 F. App'x 792 (6th Cir. 2015), that Butler repeating Sullivan's statement to Hill is hearsay because it does not satisfy Rule 801(d)(2)(D). TK Elevator's argument is misplaced because both cases are distinguishable.

In *Hill*, the plaintiff brought an age-discrimination claim. 708 F.2d at 235. At trial, one of the defendant's former managers (who the plaintiff supervised) testified that several employees told him that the defendant fired the plaintiff "because of his age and income." *Id.* at 237. We concluded that the employees' statements to the former manager were hearsay. *Id.* We did so because the employees were neither involved in the termination decision, nor were "matters bearing upon [the plaintiff's] discharge . . . within the scope of their employment." *Id.*

Similarly, in *Huffman*, the plaintiff brought a pregnancy-discrimination claim. 621 F. App'x at 798. In opposing the defendant's motion for summary judgment, the plaintiff attempted

to rely on her testimony that her coworkers told her that the defendant had accommodated another employee's injury. *Id.* at 799. We determined that the coworkers' statements "did not concern a matter in the scope of their employment." *Id.* We emphasized that "the declarants did not work in [the defendant's] human-resources department and were not involved in making accommodation decisions." *Id.*

The facts here are different. Unlike the declarants in *Hill*, "matters bearing upon" Hill's termination *were* within the scope of Butler's employment. *See* 708 F.2d at 237. And unlike in *Huffman*, Butler worked in TK Elevator's HR department. *See* 621 F. App'x at 793. Not only that, TK Elevator tasked Butler with leading termination meetings with employees and explaining the reasons for their terminations.

Consider instead *Carter* and *Moore v. KUKA Welding Systems & Robot Corp.*, 171 F.3d 1073 (6th Cir. 1999).

In *Carter*, the plaintiff alleged that a university failed to renew her teaching contract because of her race. 349 F.3d at 270. At summary judgment, the plaintiff proffered evidence that the university's vice provost told her that the decision-makers wanted to "whitewash" the faculty and were "racists." *Id.* at 273. Though the vice provost was not a decision-maker on the plaintiff's contract renewal, he oversaw the university's compliance with affirmative action requirements. *Id.* at 276. We thus concluded that statements about "the racial composition of the [university's] workforce" were within the scope of his employment and so admissible under Rule 801(d)(2)(D). *Id.* Here, too, Butler was not a decision-maker. Yet in the same way an employee overseeing affirmative action requirements can speak on the employer's racial composition, an employee overseeing termination meetings can speak to the employer's reasons for terminating employees. *See id.*; *see also Grizzell v. City of Columbus Div. of Police*, 461 F.3d 711, 721–22 (6th Cir. 2006)

24

(deputy police chief managing promotional process spoke within scope of his employment when he "spoke on the subject of promotions").

*Moore* involved race-discrimination and retaliation claims. 171 F.3d at 1076. There, the plaintiff's former coworker testified about a statement his brother-in-law, who also worked for the defendant, made during "a social occasion." *Id.* at 1081. The brother-in-law stated that the plaintiff's supervisor told him that "bad stuff[]" would happen in the area in which the plaintiff worked and that the coworker "should stay out of it unless he wanted to be fired." *Id.* We determined that—because the supervisor told the brother-in-law "to pass the message along to" the coworker—there was "some leeway" to find that the brother-in-law acted as the employer's agent under Rule 801(d)(2)(D). *Id.* No such leeway is necessary here. Butler spoke to Hill during work hours and with authority to explain the circumstances of her termination. Thus, Butler's statement that Sullivan told her that he fired Hill because she complained about harassment and discrimination qualifies as a party-opponent statement under Rule 801(d)(2)(D).

**B.**

The majority opinion concludes that Rule 801(d)(2)(D) excepts a statement from hearsay if: (1) the employee making the statement has decision-making authority, or (2) the employee has "either broad oversight or specific delegation." Maj. Op. at 8. This conclusion misreads the plain text of the rule and disregards precedent construing the rule.

Start with the plain text. The rule requires only that: (1) an opposing party's employee make a statement (2) during the employment relationship (3) "on a matter within the scope of that relationship." Fed. R. Evid. 801(d)(2)(D). The rule is silent about decision-making authority, broad oversight, or specific delegation. A company's decision-makers, and those with broad oversight, are usually those in management. But "there is nothing in Rule 801(d)(2)(D) that

requires an admission be made by a management level employee." *Union Mut. Life Ins. Co. v. Chrysler Corp.*, 793 F.2d 1, 8 (1st Cir. 1986) (Breyer, J.); *see also Carter*, 349 F.3d at 275. Nor does the rule "require that the principal authorize the specific statement made by the agent." *Cruz v. Farmers Ins. Exch.*, 42 F.4th 1205, 1213 (10th Cir. 2022). Rule 801(d)(2)(D) discarded the common-law rule "that the agent must have authority to make statements in a given area." *Nekolny v. Painter*, 653 F.2d 1164, 1171 (7th Cir. 1981). "Indeed, the Advisory Committee Notes to Rule 801 caution that limiting its scope in this manner would result in the loss of valuable and helpful evidence because few principals employ agents for the purpose of making damaging statements." *Cruz*, 42 F.4th at 1213 (citation modified). In fact, the Rules of Evidence create a separate exemption from the hearsay rule for those who have been told to make a statement. *See* Fed. R. Evid. 801(d)(2)(C) (a statement is not hearsay if it "was made by a person whom the party authorized to make a statement on the subject").

The caselaw confirms the plain text. In deciding whether Rule 801(d)(2)(D) exempts a statement from the hearsay rule, courts focus on the declarant's responsibilities and involvement with the matter being discussed, not the status of the declarant. *See Back*, 694 F.3d at 577–78; *Weil*, 922 F.3d at 999–1000 (collecting cases); *Simple*, 511 F.3d at 672 (collecting cases).

## III.

Because I believe the district court should have considered the challenged statement, I turn now to Hill's challenge to the district court's grant of summary judgment to TK Elevator on Hill's Title VII and § 1981 retaliation claims. Title VII prohibits employers from discriminating against employees because of their "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2. It also "prohibits discriminating against an employee because that employee has engaged in conduct protected by Title VII," such as reporting discrimination or harassment. *Laster v. City of*

*Kalamazoo*, 746 F.3d 714, 729–30 (6th Cir. 2014) (citing 42 U.S.C. § 2000e-3(a)). Under 42 U.S.C. § 1981, "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens," including "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." Like Title VII, § 1981 allows employees to bring "employment-related retaliation" claims. *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 454, 457 (2008).

A plaintiff bringing a Title VII or § 1981 retaliation claim can establish retaliation through either direct or circumstantial evidence. *Rogers v. Henry Ford Health Sys.*, 897 F.3d 763, 771–72 (6th Cir. 2018). "Direct evidence is evidence, which if believed, does not require an inference to conclude that unlawful retaliation motivated an employer's action." *Spengler v. Worthington Cylinders*, 615 F.3d 481, 491 (6th Cir. 2010). Instead, it "requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Geiger v. Tower Auto.*, 579 F.3d 614, 620 (6th Cir. 2009) (quotation omitted). By contrast, circumstantial evidence requires that the plaintiff create "an inference of retaliation," *Spengler*, 615 F.3d at 491 (quotation omitted), using the burden-shifting framework from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), *Rogers*, 897 F.3d at 771–72.

Hill argues that her statement that Butler told Hill during the termination meeting that Sullivan decided to fire Hill because she was "causing problems because of complaining about harassment and race discrimination," R. 54-1, PageID 865, is direct evidence of retaliation. I agree. That Sullivan fired Hill in part because of her discrimination complaints requires no "inference . . . that unlawful retaliation motivated" her termination. *Spengler*, 615 F.3d at 491; *see also Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 544 (6th Cir. 2008) (explaining that "an

explicit statement from [the defendant] that it was firing [the plaintiff] in response to his discrimination claims" is direct evidence of discrimination).

"If there is direct evidence of retaliation, then the plaintiff's case-in-chief is met, and the burden shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision absent the impermissible motive." *Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 648 (6th Cir. 2015) (citation modified). TK Elevator asserts that it terminated Hill because she violated its attendance policy. It argues that "Hill only needed one occurrence to be terminated," and that it could terminate her based on her February and March 2021 attendance violations. D. 23 at p.41.

There is a genuine dispute of material fact about how many occurrences Hill needed to accumulate before TK Elevator could terminate her. Under the CBA, TK Elevator had cause to terminate employees only after they accumulated nine occurrences in the preceding twelve months. And Hill's conditional reinstatement agreement stated that "attendance points and related discipline w[ould] be per [the] CBA." R. 54-9, PageID 885. This evidence suggests that Hill needed nine occurrences in the preceding twelve months—not just one—before TK Elevator could terminate her. Because factual disputes remain about whether Hill violated the attendance policy, TK Elevator is not entitled to summary judgment on Hill's retaliation claims.

**IV.**

In sum, the district court erred in granting summary judgment to TK Elevator on Hill's Title VII and § 1981 retaliation claims. The majority seeing things otherwise, I respectfully dissent.